## Commonwealth *v.* Ralph W. Wireback, Appellant.

*Criminal law—Murder—Insanity—Opinion of witness—Evidence.*

Where, on the trial of an indictment for murder, the defendant alleges insanity, a witness for the commonwealth who has testified that for thirty-eight years he had been warden of a penitentiary and had studied, from the conduct of the prisoners, real and feigned insanity, may be permitted to testify that feigning insanity is common among criminals, and that at times it will deceive even experts.

Where a witness testifies to acts and declarations of the prisoner, all of which are rational, the witness will not be permitted to answer this question: "From what you saw of him do you think he was of sound, or unsound mind?"

Where the prisoner alleges insanity for several months before the killing, the commonwealth may call as witnesses persons who were personally acquainted with the prisoner and who had transacted business with him within six months before the homicide, and may ask them whether they had noticed anything in his conduct or conversation irrational or indicating insanity at the times they saw and talked with him.

*Criminal law—Murder—Jury—Voir dire.*

A juryman on his voir dire cannot be asked, "Would the neglect or refusal of defendant to testify in his own behalf create any presumption against him in your mind?"

*Criminal law—Murder—Insanity.*

Where insanity, whether general or partial, is set up as a defense to an

indictment for murder, the degree of it must be so great as to have controlled the will of its subject, and to have taken from him the freedom of moral action.

The individual belief of the prisoner as to right and wrong and that his act was justified, even if sincere, does not constitute a delusion, or a phase of insanity which, as to him, at the time excused his crime.

A charge, on the defense of emotional insanity, that "an individual who has sufficient intelligence to know that loading a pistol or gun, pointing it at a human being, and pulling the trigger are acts which may or will cause the death of the person against whom they are directed, should not be acquitted on the ground of insanity," immediately preceded by a charge that a delusion, "to render a person irresponsible for an act which would otherwise be criminal, must be a delusion that a state of facts exist which, if really existing, would excuse the act he was about to commit," and immediately followed by the charge that the doctrine that an individual can be entirely sane immediately before and immediately after such act was committed, and yet insane at the instant it was committed, is contrary to every principle of psychological science, is not erroneous.

The law presumes sanity if no insanity be shown, and if the prisoner was sane shortly before and shortly after the murder was committed the presumption is of sanity at the time of the act, which presumption can only be rebutted by his showing some especial frenzy or madness connected with the act, which at the instant irresistibly impelled him to commit it.

A murder, which is otherwise of the first degree, is not reduced to murder of the second degree by a doubt as to the sanity of the murderer, as insanity is either a complete defense or none at all.

To convict of murder of the first degree, the commonwealth must prove beyond a reasonable doubt the unlawful killing and the fully formed purpose to kill; but it need adduce no proof whatever of the sanity of the prisoner, as the legal presumption of sanity is conclusive in the absence of evidence to rebut it. If the accused alleges insanity, he must establish it by fairly preponderating evidence, or the presumption of sanity which the law raises stands unshaken.

There was evidence that, up to a few months before the homicide, defendant was a kind husband and led an ordinary life; that about that time he became morose and abusive, and had fits of jealousy; that he suffered from real or imaginary disease, and resorted to absurd and childlike methods of cure; that he ate and slept but little during the week preceding the homicide; that there was insanity in near collateral relations. Three medical experts testified that he was insane. A large number of witnesses who had known him for years, and had transacted business with him down to the date of the homicide, had not noticed any indications of insanity. The keeper of the prison who had charge of him after his arrest testified that he gave no evidence of insanity, and a number of physicians testified that he was not insane. *Held*, that it was sufficient to sustain a finding that defendant was not insane.

Argued Jan. 30, 1899. Appeal, No. 397, Jan. T., 1899, by defendant, from judgment of O. & T. Lancaster Co., April T., 1898, No. 144, on verdict of guilty of murder of the first degree. Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before LIVINGSTON, P. J.

The facts appear by the opinion, of the Supreme Court.

Verdict of guilty of murder of the first degree on which judgment of sentence was passed.

*Errors assigned* sufficiently appear in the opinion of the Supreme Court.

*John M. Groff* and *C. Eugene Montgomery,* for appellant.— A person may be qualified to testify as an expert either by study without practice or by practice without study, but not by observation, without study or practice : Com. v. Pannell, 86 Pa. 260; Com. v. Farrell, 187 Pa. 408.

If the prisoner commits the act under a fixed bona fide belief, which is a delusion, that certain facts existed which were wholly imaginary, but which, if true, would have been a good defense, and the jury are satisfied that such delusions clearly existed, it will entitle the prisoner to an acquittal: Sayres v. Com., 88 Pa. 299.

Prisoners in challenging jurors may examine them as to their knowledge of circumstances, their expressions, opinion and prejudices, and a juror is bound to disclose what he may know in time for the accused to cross-examine him and explain or contradict his testimony : Howser v. Com., 51 Pa. 332; Allison v. Com., 99 Pa. 17; Staup v. Com., 74 Pa. 458.

Evidence tending to show insanity, although considered by the jury insufficient to establish the same, may have the effect of reducing the degree of murder: Com. v. Eckerd, 174 Pa. 147; Meyers v. Com., 83 Pa. 143; Com. v. Drum, 58 Pa. 15.

*John A. Coyle* and *W. U. Hensel,* with them *George A. Lane* and *W. T. Brown,* district attorney, for appellee.—Michael J. Cassidy was a thoroughly competent witness for the single purpose for which he was called, viz: to rebut Dr. Mills's testimony

that criminals feigning insanity do not often feign delusions: Com. v. Farrell, 187 Pa. 408; Taylor v. Com., 109 Pa. 262.

A nonexpert witness will not be permitted to express an opinion as to the prisoner's sanity where the acts and conversations upon which the opinion is based, as well as the phase of insanity sought to be proved, have no bearing on the mental condition of the prisoner at the time he committed the crime: Com. v. Buccieri, 153 Pa. 535; Com. v. Cleary, 148 Pa. 26; Wartena v. State, 5 N. E. Rep. (Ind.) 20; People v. Durfee, 29 N. W. Rep. (Mich.) 109.

The case was fairly tried upon defendant's theory of delusional insanity: Sayres v. Com., 88 Pa. 299; Taylor v. Com., 109 Pa. 270.

Defense had no right to ask jurors on their " voir dire " the probable effect on their minds of certain lines of defense: Com. v. Van Horn, 188 Pa. 143; Hall v. Com., 22 W. N. C. 25.

Mental incapacity must be established by the weight of the evidence: Com. v. Woodley, 166 Pa. 463; Com. v. Gerade, 145 Pa. 289; United States v. Ridgeway, 31 Fed. Rep. 144; Coyle v. Com., 100 Pa. 578; Pannell v. Com., 86 Pa. 268.

OPINION BY MR. JUSTICE DEAN, February 27, 1899:

Wireback, the defendant, was convicted of murder of the first degree in the court below, and sentenced to be hanged; hence this appeal.

It appears from the evidence, that he was forty-eight years of age; was a manufacturer and vender of a patent medicine; in conducting his business, he traveled over Lancaster and the adjoining counties; his place of business, however, was in Lancaster city, where he made his home with his family, a wife and two sons. They lived in a dwelling house, the property of D. B. Landis, a reputable and prominent resident of Lancaster. On July 1, 1897, Landis, leased to him by writing the house until April 1, 1898, with the privilege of an extension for one year after the expiration of the term, if he, Landis, did not in the mean time sell the property. Landis did sell, about the last of August, 1897, and Wireback had knowledge of the fact, and also knew he must, by the contract, give up possession on April 1, following. He continued, however, to pay his monthly rental promptly, but notwithstanding the unmistak-

able terms of his contract, frequently complained to his neighbors that his landlord, Landis, intended to wrong him by dispossessing him, when he had a right to another year's occupancy; more than once, when making known his alleged grievance, he used threatening language, such as, that he would have vengeance against any one who came into the house, and that his principle was "justice or death." About a week before April 1, he went to a store outside the city and purchased a breach loading shotgun, with some large ammunition, saying that he "was going to have a fuss the 1st of April with a man about house rent." He then bought cord wood and had it hauled to the house; with this and other materials he barred the cellar door, and also, by like methods, closed the other entrances on the first floor of the house. As he refused to move on April 1, Landis instituted suit for possession before an alderman under the landlord and tenant act, and having obtained judgment, had issued thereon to a constable the usual warrant for possession. On the morning of April 7, the constable, Graef, another constable, Price, D. B. Landis and his son, with three other men employed by Landis, seven in all, proceeded to the house to dispossess Wireback; finding the doors barricaded, they broke open one or more of them, and entered to the first floor, Wireback retreating upstairs to the second; in that position there was a parley between him and the officers; they asked him to come down; he refused, declaring that they had come there to kill him; about that time Wireback requested to see D. B. Landis, the deceased, who in response went up the stairs, and on reaching the landing discovered that Wireback had fled to the garret; he went to the foot of the garret stairs, and Wireback, who was behind a barricade at the top, called out to him, "Mr. Landis, what do you intend doing for me and my family?" Landis commenced to reply, saying "I will—" or "Well, I will—" when Wireback, from behind the barricade, fired from the shotgun the charge which struck Landis in the head and killed him instantly. Wireback neither fled nor resisted arrest. There was no substantial dispute as to the facts thus narrated. At the trial, the only defense was insanity. The evidence tending to show unsoundness of mind, consisted mainly of a course of conduct distinct from and at variance with that of his life before August, 1897, when he learned of

the sale of the house. It was alleged, and the evidence tended to show, that before that time, he was a kind husband and had led an orderly life; that commencing about that date, and continuing down to the killing of Landis, he was at times morose, was abusive toward his wife, had fits of jealously, and showed a disposition to lewdness; there was, also, evidence, that he suffered from bodily disease, either real or imaginary, and had resort to childish and absurd methods of cure. Further, there was evidence of insanity in near collateral relatives of his father and mother. During the week preceding the homicide, he slept and ate but little. The theory of defendant's counsel, very earnestly argued in the court below and here, is, that Wireback, about the time he learned that he must give up the house, was diseased in body, and was severely pinched in money affairs; the consequence was, his mind became disordered; that this condition continued down to the time the attempt was made to dispossess him; that then he firmly believed the purpose of the officers, under the direction of Landis, was to attack and kill him; and that, acting on a firm conviction that this was their purpose, he resisted by opposing force to force in defense of his life. That, although this was a delusion, yet to him being a fact, the duty of defending his own life as he did, was to him imperative. There was evidence on the part of members of his family, and three medical experts, Doctors Mills, Gerhart and Diller, tending to sustain this theory. As opposed to it, the commonwealth called a very large number of witnesses who had known defendant for years, and down to the date of the homicide had transacted more or less business with him, yet had never observed any indications of unsoundness of mind; besides these, the keepers of the prison, who had every opportunity to observe him after his arrest, for more than four months, testified that during that time he gave no evidence of insanity. Physicians, one of them, Dr. Chapin, an eminent specialist, were of the opinion that, from the testimony as to defendant's conduct immediately before and after the shooting, he could not have had such frenzy or delusion at the moment the shot was fired as suggested by his counsel. The court submitted the somewhat conflicting evidence on the question of sanity to the jury, who having found defendant guilty of murder of the first degree, he was sentenced accordingly, and we now have this appeal, with fifty assignments of error.

The first three and sixth to fifteenth inclusive, allege errors in the admission and rejection of evidence.   Michael J. Cassidy, warden of the eastern penitentiary, being called, testified, that for thirty-eight years he had been an assistant and warden of that institution, and during that time, had observation of several thousand criminals; that as a necessity in the performance of his duty, he had studied, from the conduct of the prisoners, real and feigned insanity; that very many prisoners feigned insanity for the purpose of being removed to city hospitals, whence they could more easily escape; that many of them feigned delusions, as the most convenient method of deception. And some had successfully deceived him and physicians.   The defendant objected to this testimony, as incompetent, because the witness was not a physician, nor a graduate of any institution of learning, and therefore, not an expert whose opinion was admissible.   To sustain the objection Commonwealth v. Farrell, 187 Pa. 408, is cited, where the witness testified to a fact depending largely on conclusions derived from scientific anatomical investigations; his opinion derived wholly from his own observation of corpses was ruled inadmissible, because of the doubtfulness and sparseness of the facts on which it was based.   But Cassidy was not called as a scientific expert in diseases of the mind, but to establish a fact observable by any intelligent man with like opportunity.   That for thirty-eight years, thousands of prisoners had been under his care, and that many of them feigned insanity and pretended delusions, he knew, because, when they failed to accomplish their purpose by the pretense, it was abandoned, and they resumed the normal conduct of sane men.   The defendant, when charged with a high crime, committed acts and made declarations, which tended to show aberration of the mind and delusions.   The commonwealth answered, but in these acts and declarations the accused might be merely feigning insanity to escape punishment, and they called one abundantly competent to testify that such conduct is common among criminals, and that at times it will deceive even experts.   This is one of the very facts on which scientific experts base their deductions, and it was proper for the consideration of the jury in determining the value of defendant's expert testimony as to his sanity.

The sixth assignment is to sustaining the objection of the

commonwealth to the opinion of Mrs. Kate L. Shertzer, a witness called by defendant. After stating that she was a neighbor of Wireback, and had seen him often; that he was nervous and excited, especially on April 1; that he said he was wronged, but that Landis would do the right thing by him; she was asked: "From what you saw of him, do you think he was of sound or unsound mind?" This was objected to, because the witness had stated no facts warranting an opinion. The court properly sustained the objection; no foundation for an opinion was laid; every act and declaration of the defendant testified to by her was rational. If her opinion was, that defendant was insane, it necessarily was based on facts other than those stated.

The seventh to sixteenth assignments complain, that the court erred in overruling objections to the admissibility of the opinion of witnesses called by the commonwealth. Nine witnesses were called, who testified to a personal acquaintance with defendant, to having seen him, and to having transacted business with him, some a short time before the homicide, others within three or six months of it; all stated their opportunities for observation; then, in substance, this question was put to each: "From the conversation you had with the prisoner at the time you stated, and from your observation of his conduct, manner and appearance, did you or did you not discover anything that would lead you to believe he was of unsound mind?" Against defendant's objection, the witness was permitted to answer. In this, there was no error. The witnesses were not asked to give their opinion affirmatively, as to whether the defendant was of sound mind, for they had stated nothing to warrant such opinion; but whether they had noticed anything in his conduct or conversation irrational or indicating insanity at the times they saw and talked with him, was clearly competent. The defendant alleged that he gave evidence of insanity for a period of eight months before the homicide; the commonwealth could answer it in no other way than by calling those who had seen and conversed with him during the same time, to testify that they had noticed nothing indicating unsoundness of mind. The defendant might well argue that this negative, when compared with his affirmative

testimony, was the weaker, but his objection to its admissibility is not well founded.

The twenty-third to thirty-sixth assignments, are to the refusal of the court to permit this interrogatory by defendant's counsel to jurors when called to the box : " Would the neglect or refusal of defendant to testify in his own behalf create any presumption against him in your mind? " The question was wholly unwarranted; it reflected on the integrity of the juror. He might as well have been asked whether, if sworn as a juror, he would obey the law. No liberality of examination of jurors on their voir dire, accorded to those accused of crime, authorizes a question which in its insinuation, must be an insult to an honest man. The court properly disallowed it.

The forty-second to forty-eighth assignments inclusive, are to rulings on hypothetical questions to physicians and other witnesses. Whether the hypothesis propounded to the witness included the material facts necessary to the formation of an opinion, or whether facts are assumed, which have no existence, rests largely in the knowledge of the trial judge, and necessarily must control him in his rulings. The evidence, as before him, is seldom so clearly before us. A careful inspection of the evidence, the hypothetical questions, and the rulings connected therewith, complained of in these assignments, fails to convince us that any error was committed by the court.

The fourth, thirty-seventh, thirty-eighth, thirty-ninth, fortieth, and forty-first assignments, all complain of errors of law in the charge and answers to points. There is probably no feature of criminal law which has been so frequently the subject of judicial consideration and opinion as that of insanity as an excuse for crime. Text-writers on medical jurisprudence and courts, are, on some phases of the subject, at variance. The enunciation of the law in our own state, for many years at least, has been consistent. While conceding the existence of different types of insanity, we have persistently declined to refine upon it with the specialists, and measure criminal responsibility according to the exact degree of it. Any departure from the condition of a well balanced mind is often pronounced insanity by science. It has even been argued with plausibility by theorists, that all are insane on one or more subjects, or labor under some delusion or other. But these speculations and

refinements help but little in the practical administration of justice; the moral guilt of one man, by reason of vicious training or inferiority of intellectual power, may be less than that of another, but the law takes no note of this in fixing responsibility for crime; nor dare it do so, if society is to be protected. Therefore, since Commonwealth v. Mosler, 4 Pa. 264, decided more than a half century ago, it has been held in this state thus: "The law is that, whether the insanity be general or partial, the degree of it must be so great as to have controlled the will of its subject, and to have taken from him the freedom of moral action." Further in the same case, it is said: "A man may be mad on all subjects; and then, though he may have glimmerings of reason, he is not a responsible agent. This is general insanity. . . . Partial insanity is confined to a particular subject, the man being sane on every other. In that species of madness, it is plain that he is a responsible agent, if he were not instigated by his madness to perpetrate the act. He continues to be a legitimate subject of punishment, although he may have been laboring under a moral obliquity of perception, as much as if he were merely laboring under an obliquity of vision."

In Sayres v. Commonwealth, 88 Pa. 299, the court below charged the jury thus: "If the prisoner, although he labors under partial insanity, hallucination or delusion, did understand the nature and character of his acts, had a knowledge that it was wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and knew if he did the act, he would do wrong and would receive punishment; if, further, he had sufficient power of memory to recollect the relation in which he stood to others, and others stood to him, that the act in question was contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty, he would be responsible." This Court, on appeal, approved this instruction, saying, "The case was treated with marked accuracy and care by the learned judge of the court below."

In the same case, the court instructed the jury, that if the prisoner bona fide labored under a fixed belief that his assailant was attempting to take his life, although such belief was a delusion, and he killed him as he supposed in self-defense, he was exempt from punishment.

We have very many reported cases involving the same question, but in not one of them has there been any substantial variation in the law as quoted from these two cases. Reading carefully the charge, including the answers to defendant's points, we think it was a correct enunciation of the law, and entirely fair to the defendant. It was not pretended, nor could it be on the evidence, that the killing of Landis was not conceived by defendant weeks before, determined on, and the means of accomplishing it provided when the gun and ammunition were bought; then deliberately and methodically committed when the looked-for opportunity occurred. His preceding conduct and preparation for the act evince mental soundness. Concede that, in flagrant disregard of the terms of his contract, he termed Landis a wrongdoer in attempting to dispossess him; this proves nothing that warrants an inference of insanity. Observation teaches that men of crude ideas as to property rights, or of vindictive dispositions, not seldom act as if wronged, when called upon to pay an honest debt or perform an honest contract obligation. He may have wrought himself into a belief that Landis ought not to retake possession of his property; if so, it was a mere perversion of the moral sense, prompting him to violate a law of property because it seriously inconvenienced him; then, but a step further in the same direction, in assumed self-defense, he violated the law protecting the person of Landis. The whole argument of appellant rests on an unsubstantial foundation, to wit: that the individual belief of Wireback, as to right and wrong, if sincere, constituted a delusion, or a phase of insanity, which as to him, at the time, excused his crime. The same sort of delusion would excuse a Mormon elder who entered into plural marriage contracts in this state. He not only believes his conduct not wrong, but that it is divinely enjoined. But the law tolerates no mere individual opinion, however sincere, as an excuse for breaking the law; itself establishes the rule of conduct for the individual in his relations to society, enjoins what it deems right and prohibits what it deems wrong, and to this rule he must conform or take the consequences. The whole evidence, in one view of it, tended to show that Wireback, with full knowledge of the law, set up his own standard of right and wrong with reference to his contract with Landis and their

respective duties under it, and followed that standard to the end. To indifference to this distinction, the rule of action prescribed by the law, and a rule of action violative of it prescribed by Wireback for himself, is owing the burden of appellant's complaint of the charge. The learned judge of the court below, throughout, had it fully in view, and so declared the law that the jury could not have failed to understand it. Defendant's ninth point and the answer thereto really lay down the law as his counsel requested, thus:

" 9. If the jury believes that the reason, judgment and understanding of the defendant were overthrown at the time of the shooting, and he really did not know what he was doing, the verdict must be not guilty, on the ground of insanity. *Answer:* This point is affirmed, provided the jury are satisfied from a fair preponderance of the evidence that at the time of the commission of the act the defendant had not, by reason of insanity, the power or capacity to distinguish between right and wrong at that time, in reference to the act he was about to and actually did commit."

This point and answer, in connection with the instruction in the general charge: " That no mere moral obliquity of perception will protect a person from punishment for his deliberate act," presented both the defendants and the commonwealth's legal contention perspicuously. The complaint that the court erred in saying to the jury that, " an individual who has sufficient intelligence to know that loading a pistol or gun, pointing it at a human being and pulling the trigger, are acts which may or will cause death of the person against whom they are directed, should not be acquitted on the ground of insanity," is error, if wrested from its connection, and treated as an isolated sentence. But, to determine whether the jury could have been misled, it must be considered, not only with what precedes and follows, but in view of the idea then being elucidated. Counsel, as shown by their written point, contended, that, if at the time of the shooting the reason of defendant was overthrown, so that he did not know what he was doing, he should be found not guilty, on the ground of insanity, and this, irrespective of the soundness of mind immediately before and after the shooting. If Wireback was sane immediately before and immediately after the shooting, clearly the law would presume him

sane when he fired the shot, and this presumption could only be rebutted by his showing some special frenzy or madness, connected with the act, which at the instant irresistibly impelled him to commit it. There was nothing in the act itself or the method of it which tended to rebut the presumption. A previously prepared loaded weapon in his hands, sheltering himself behind the barricade at the head of the stairs, luring Landis, the special object of his animosity, to the foot of them, the assured aim at a vital part of the body, all indicated intelligence and reasoning power; certainly, if he were sane immediately before and immediately after such acts, he should not, from any inference to be drawn from them, be acquitted on the ground of insanity. As showing conclusively the meaning, the court below immediately follows this remark by saying: " The doctrine that an individual can be entirely sane immediately before and immediately after such act was committed, and yet insane at the instant it was committed, is contrary, as writers say, to every principle of sound psychological science. . . . Our Supreme Court has said the law presumes sanity if no insanity be shown, and if the person was sane shortly before and shortly afterwards, the presumption is of sanity at the time of the act." The meaning is further shown by the instruction immediately preceding the sentence complained of, as to an insane delusion that the officers had come to kill him, and that self-defense was his right and duty, thus: " You will readily perceive, therefore, that a delusion, to render a person irresponsible for an act which would otherwise be criminal, must be a delusion that a state of facts exist which, if really existing, would wholly excuse the act he was about to commit." The court thus impressed upon the jury the distinction between a thoroughly tenable ground of defense, a bona fide delusion as to a fact, to wit: that the purpose was to kill him, and an untenable ground, with nothing in the evidence to support it, to wit: from the act of shooting, itself, instantaneous and momentary frenzy, which prompted the act. The court did not, as argued, by this sentence sweep away the defense that Wireback fired the shot under the delusion that he was acting in defense of his life against those who unlawfully sought it. Defendant's first point, which raises the question, is substantially affirmed. The jury was told that if defen-

dant committed the act under any delusion which controlled his will and made the commission of the act a duty of overruling necessity, the verdict should be not guilty on the ground of insanity, but the court unnecessarily went further and added, if the delusion deprived him of all freedom of agency, the verdict should be not guilty on the ground of insanity. This addition was not suggested by any evidence that we have discovered, and left open to the jury a field for conjecture that certainly was not prejudicial to defendant.

Defendant's seventh prayer for instruction was that: " The jury need not be satisfied of the insanity of the defendant beyond a reasonable doubt, and must render a verdict of not guilty on the ground of insanity if they have a reasonable doubt." To which the court answered: " The presumption is that at the time of committing this crime Ralph W. Wireback was sane, and the burden of proof of insanity being upon him, the defendant, he must satisfy the jury by a fair preponderance of the evidence submitted to them that at the time he committed the act, he was insane to such an extent that insanity controlled his will, and made the commission of the act he committed appear to him a duty of overruling necessity, or deprived him of all freedom of agency. If he fail to do so; if the fair preponderance of the testimony does not so satisfy the jury of such insanity, but only creates a doubt of his sanity, or reasonable doubt of his sanity, it is insufficient to justify an acquittal, and the jury should return a verdict of guilty in such case."

More than once we have attempted to settle the question raised by the assignment of error to the answer to this point. To convict of murder of the first degree the commonwealth must prove beyond a reasonable doubt the unlawful killing and the fully formed purpose to kill; it need adduce no proof whatever of the sanity of the prisoner; the law presumes that, and the presumption is conclusive in the absence of evidence to rebute it. If the accused alleges insanity, he must establish it by fairly preponderating evidence, or the presumption of sanity which the law raises, stands unshaken: Coyle v. Commonwealth, 100 Pa. 578 ; Commonwealth v. Gerade, 145 Pa. 289 ; Commonwealth v. Woodley, 166 Pa. 463. Either the jury remain convinced of the prisoner's sanity, by the legal presumption against him, or they are convinced of his insanity by the preponderance of evi-

dence in his favor; there is no middle ground which the law recognizes; nor does a doubt of sanity reduce the grade of the crime to murder of the second degree. From the very nature of the mental disease, there can be no grading of it by degrees so as to accord with a degree in crime. To say that a man is insane to an extent which incapacitates him from fully forming an intent to take life, yet enables him to fully and maliciously form an intent to do great bodily harm without a purpose to take life, is absurd, for the one involves the same test of responsibility as the other, the ability to distinguish between right and wrong. Either the offense of defendant is wholly excused, because the jury is satisfied by the preponderance of evidence of his irresponsibility, or he is guilty, because the evidence fails to so satisfy them.

We have thus gone over, very carefully, the evidence and assignments of error, because the gravity of the judgment against defendant seemed to demand it. We are convinced he had a lawful and impartial trial, and that the evidence was amply sufficient to warrant the verdict.

As to the objection to remarks of commonwealth's counsel to the jury, the assignment of error is irregularly preferred here, and we do not discuss it.

The judgment is affirmed, and it is ordered that the record be remitted to the court of oyer and terminer of Lancaster county that the judgment may be carried into execution according to law.