From Otto Herbst, Erie, Pa.

## Commonwealth v. Scott.

J. B. Adams, District Attorney, and A. E. Jones, Assistant District Attorney, for Commonwealth.

W. C. McKean, for defendant.

Morrow, J., June 17, 1930.—The defendant, John L. Scott, was charged with the murder of Emma Hertzog. On being arraigned he pleaded guilty of the murder whereof he stood indicted, leaving it to the court to determine the degree of the crime, and the punishment, under section 74 of the Act of March 31, 1860, P. L. 382, and section 75 of said act as amended May 14, 1925, P. L. 759. We proceeded, by examination of witnesses, to determine the degree of the crime. Much testimony was taken; that on behalf of the defendant being for the purpose of showing that he was of such mentality as to be guilty of murder in the second degree, but not of murder in the

first degree. This will be considered hereinafter. Counsel for the defendant did not call the defendant as a witness in his own behalf and offered no testimony touching upon the killing. Consequently, the testimony introduced by the Commonwealth concerning the murder and as to the actions and statements of the defendant thereafter stands uncontradicted and undisputed. It may not be incumbent on us to discuss the evidence: Com. v. Paul, 289 Pa. 452. However, we will make mention of important parts thereof before stating our conclusion.

Mrs. Emma Hertzog was a woman about seventy-seven years of age. Her husband had died a year or two prior to her death. They had lived for many years on a small farm in Springhill Township, Fayette County, and she had continued on the farm after her husband's death. The defendant, a single man, about forty-six years of age, was a nephew of Mrs. Hertzog, the son of a sister of hers. Much of the time during the last thirty years or longer he made his home with Mr. and Mrs. Hertzog. After Mr. Hertzog's death he continued making his home with his aunt. Just prior to her murder she had made arrangements to move from the farm to Point Marion. The defendant was not to move with her. She had her household goods and furniture that she intended to take packed and wrapped ready for moving, and had arranged with a truckman living at Gans Station, a half mile away, to come on the morning of Oct. 19, 1929, and move her and her belongings to her new home in Point Marion. He was in his truck in his garage shortly after seven o'clock that morning, ready to start to Mrs. Hertzog's, when the defendant came up and told him she didn't want to move that day, but would sometime the next week. The defendant seemed natural and there was nothing about his appearance or conduct to arouse any suspicion that he was deceiving. The defendant then went from the garage to where Charles Conn was about to begin husking corn in a field by the road, one-fourth mile away, in the direction of the Hertzog home. This was before eight o'clock in the morning. He volunteered to help Mr. Conn husk corn, stating that he did not have anything to do. Mr. Conn thought nothing of this, as the defendant had before helped him and other neighbors with their farm work. They husked corn until about ten o'clock in the forenoon, when they took the corn to Mr. Conn's home, near Gans Station, unharnessed the horses and the defendant left, accepting no pay for his work. Mr. Conn asked him to have dinner, but he declined, stating he would eat sometime when he could eat more. During all the time the defendant was with Mr. Conn he never mentioned Mrs. Hertzog. He then went to the Burchinal store, opposite the station at Gans, and was around the store and station for perhaps two hours, waiting, ostensibly, for the local freight train on which he was expecting some roofing material for Andrew Hertzog, who lived near. None came on the train and he went to Andrew Hertzog's, repaired some fence and left about three o'clock in the afternoon. Up to this time no one noticed anything unusual in the defendant's appearance or actions. A half hour later he appeared at the Ruble home, located some six hundred feet east of the home of Mrs. Hertzog. The Paul Conn home is about the same distance west of her home, and is nearer Gans Station. These houses are the two closest to Mrs. Hertzog's. At the Ruble home he inquired for Mrs. Ruble, who was away. Her daughter, Nancy, a young lady, was there. He said to her, "Emma is dead," adding that he had found her on the floor dead. She asked him if he wanted her to go down, and he replied that he did not, that he would get Mrs. Conn. He then went to the Paul Conn home and made the same report to Mrs. Conn, who went with him at once to the Hertzog home and saw Mrs. Hertzog lying dead on the

kitchen floor. She was lying on her stomach, with the right side of her face on the floor and her hands underneath her body. There was about a teaspoonful of blood on the floor underneath her head. This had come from her ear. Mrs. Conn and the defendant picked up Mrs. Hertzog and laid her on a bed in the adjoining room. The body was then cold and stiff. She did not suspicion that Mrs. Hertzog had been murdered, nor did the other neighbors who soon came in. It seems to have been assumed that she died of a stroke or heart trouble. The undertaker was called and the body was taken to his morgue at Smithfield. Mrs. Conn stayed and cleaned the blood from the kitchen floor, started the fire and prepared supper for the defendant. She left while he was eating, he remaining there alone.

The undertaker called the coroner, who came that evening and with him was the county detective. His examination disclosed marks of violence on the body of the deceased. He found a discoloration under the left eye, as though the eye had been blackened; a bruise on the right cheek; a bruise on each arm, the one on the left showing five distinct marks, indicating it had been made by a grip of the hand, the marks being of the four fingers and thumb; and on the neck were two marks or grooves. One was a deep groove on the front of the neck below the chin, extending from ear to ear. It was a deep groove in the skin and muscle of the neck. The other was parallel therewith, but not deep. The coroner found some rope in the kitchen, on the stairway, that fitted perfectly in the deeper groove. It was small rope, such as had been used in binding the carpets, which were ready for moving. The cause of death was strangulation.

The county detective and the coroner found the defendant at the Ruble home that night. He affected innocence, stating that Mrs. Hertzog had intended moving that morning, but complained of feeling ill and asked him to notify the man who was to do the moving that she would like to postpone it until sometime the following week; that he did so, then assisted Mr. Conn for two or three hours at corn husking; after this, waited at the station for the train, expecting some roofing for the A. J. Hertzog barn, and, none being put off at the station, he went on up to the A. J. Hertzog farm, repaired a fence and gathered some chestnuts, which he brought down to the house, and, after talking a short time to a man there, went back to the home of the deceased, arriving there about three-thirty. On going into the house he discovered Mrs. Hertzog lying on the floor and immediately went to the Ruble home and the Conn home, giving notice of her death. He said she had had trouble with her heart, and it was a case, so far as he could see, of being heart trouble.

The defendant accompanied these officers back to the morgue. He there saw the rope fitted into the groove on the neck of the deceased, and then said: "It looks like murder, all right," repeating this statement a little later in the automobile, before they left Smithfield, and inquired in substance whether it would be possible for tramps or bums to have come along there and attacked the old lady for her money. This was on Saturday night, Oct. 19th. The county detective kept him in his custody while continuing his investigation. Sunday night he accused the defendant of the crime, but he denied it. The defendant was then taken to the state police headquarters at Greensburg and on Monday evening he made a statement admitting guilt, which he substantially repeated the following night after being brought back to the county detective's office. This latter statement was introduced in evidence after the stenographer who wrote and transcribed it, and the four officers who were present when it was made and who witnessed the defendant's signature

thereto, had all testified that it was voluntarily made by the defendant. Before making this statement the officers had taken him out to the home of the deceased, where he showed them how Mrs. Hertzog came to her death, his statements then being in line with his written statement made later that night, as aforesaid, but not at the same length, so far as the evidence discloses.

In this written statement he says that he got up on the morning of Oct. 19, 1929, about five-thirty, had breakfast prepared by Mrs. Hertzog, after which they got to quarreling, she running after him and making fun of him; that she got the poker after him and threatened to kill him, and he choked her a little, she having a handkerchief around her neck, which he grabbed and choked her, and she began coughing and coughed until she died; that she went down on her knees coughing and was strangled to death, but that he did not intend to kill her; that he did not know how she got the discoloration below the left eye and the bruise under the right; that he didn't think he hit her; that he threw the handkerchief into the fire in the stove, then went and stopped the drayman from coming, not wanting him to find the body. His recital in this statement of his subsequent actions is the same as given previously to the county detective and hereinbefore noted.

The defendant did not go on the witness-stand and deny any of the testimony against him. Must we accept as true that part of his final statement that he choked the deceased to death by grabbing and twisting a handkerchief that was around her neck, doing this after she had assaulted him with a poker? In this statement, aside from his plea, he in effect admits having made prior false statements to the officers. "The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt:" Com. *v.* Spardute, 278 Pa. 37, 43. His latter statement ranks no higher than his former. Neither was given in court under oath. It may contain self-serving matter, or fabrications, as well as did the former. "It is not to be supposed that all parts of a confesson are entitled to equal credit. The jury may believe that part which charges the prisoner and reject that part which is in his favor, if they see sufficient grounds for so doing:" Com. *v.* Rush, 277 Pa. 419, 423. What the jury may do, the court may do when acting in place of the jury. We do not give credence to the defendant's statement that he acted in self-defense. He was an able-bodied man, forty-six years old, and the deceased was an old woman, some seventy-seven years of age. The groove in the muscle of her neck, into which the rope found near by made a perfect fit, and the fact that it is not reasonable to believe that a handkerchief would have made such a groove, and a smaller one parallel to it, together with the further fact that no handkerchief was found, all lead to the conclusion that the defendant strangled the deceased till she died with a rope wrapped twice about her neck and drawn very tight and so held, or tied and left there, for a sufficient length of time to make these lasting indentations in the flesh. The only other satisfactory explanation of the two marks on her neck is that two pieces of rope were used, instead of one piece wrapped twice around the neck. Either view negatives the idea that the defendant did not intend her death: Com. *v.* Millien, 291 Pa. 291. The burning of the handkerchief, if he did burn it, which is not to be credited, would in itself be a circumstance from which guilt might be inferred: Com. *v.* Jones, 297 Pa. 326, 333. Any such burning must have immediately followed the killing. There was no fire in the stove when the body was found. It may be suggested that a motive for the killing was not shown. This was not essential. The

murder is admitted. However, it does appear that the defendant had made his home with the deceased for many years. She was moving away to a new home, not taking him along. Resentment for what one believes is less than his due may be a motivating impulse toward vengeance.

In the picture shown by the Commonwealth's evidence and the defendant's plea appears the defendant cool and calm within a few minutes after having murdered his old aunt, deliberately falsifying in order to deceive and prevent the discovery of her dead body; within an hour or two he is working unconcernedly with a neighbor in a field close by the scene of his crime; he is associating with others as usual later in the day, then gives notice to his neighbors that he had discovered his aunt lying dead in her home, planting in their minds the idea that she died of heart trouble; he assists in placing her dead body on the bed, standing about as the undertaker comes and takes away the body, then quietly eats his evening meal alone in the kitchen where that morning he had strangled to death the one who had cooked for him for years; he attempts to deceive the officers and make them believe the death was natural, and when shown evidence to the contrary, suggests that a tramp might have attacked the old lady for her money; he denies guilt when accused of the murder a day later, and maintains his innocence for two days or longer under rigid examination by experienced officers, and then finally makes a confession, in which he attempts to excuse himself on the plea that the old lady—a woman seventy-seven years of age—had attacked him with a poker by the breakfast table in the kitchen, a room having at least three exits, and that he choked her by grabbing a handkerchief she was wearing about her neck, not explaining how her eye was blackened. The defendant, when arraigned in open court, said that he was guilty of murder, and, upon being confronted with this picture of unusual coolness, cunning and deceit, he had nothing to say in extenuation.

We find beyond a reasonable doubt, under all the evidence in the case, that the defendant is guilty of wilful, deliberate and premeditated killing, that is, of murder in the first degree, unless the evidence introduced by the defense relative to the mentality of the defendant warrants us in reducing the grade of his offense to murder in the second degree.

Counsel for the defendant called Dr. Edward E. Mayer, a specialist in mental and nervous diseases, and offered to prove by him that the mental condition of the defendant at the time of the offense charged in the indictment and for many years prior thereto was "such as to preclude a condition of mind showing cool premeditation or accurate contemplation of a malicious act or to contemplate and frame a specific intent to take life with a full and conscious knowledge of his purpose so to do." He stated that this was for the purpose, not of excusing or avoiding all amenability for the crime charged in the indictment, but to establish under the plea entered in this case and under all the evidence submitted that the grade of the offense arises no higher than that of murder of the second degree. Objection was made to the admission of the testimony. Having in mind the fact that there was an admission of guilt to the extent of second degree murder, we suggested that insanity was either a complete defense or none at all, but that we would hear the testimony, particularly in view of the fact that it was our duty to fix the punishment. For this reason, the admission of the testimony was proper: Com. v. Parker et al., 294 Pa. 144. It remains to consider whether the testimony given can, under the law of this State, have the effect suggested in the above entitled statement of the purpose for which it was offered.

The testimony of Dr. Mayer was that the defendant was a mental defective, but not insane; that, medically speaking, he had no insanity, but was feeble-minded; that is, inherently defective. He stated that there are three grades of feeble-mindedness—the high grade, a middle grade and a low grade. Below the last mentioned grade comes the imbecile and below the imbecile is the idiot. By use of the Stanford revision intelligence tests he found that the defendant was a middle grade feeble-minded person. Using the fifteen years' level for maturity, he got an intelligence quotient for the defendant of sixty, indicating that under these tests he was 60 per cent. up to normal, or on the nine-year-old level, which he stated to be the level of the middle grade feeble-minded person, the person who can do ordinary work and who will get along in the ordinary run of things, but cannot do things with reflection, with the judgment of a matured person. It follows, according to the doctor's testimony, that such a person would not have the full understanding of right and wrong that a matured person should have and would not understand the consequences or the full intent of his act as a matured person should do. As respects the defendant, he stated that he regarded him as unable to comprehend to the full extent the significance of his acts; and, further, that, in his judgment, the defendant's condition of mind would remain throughout life as it then was. In corroboration of the opinion of Dr. Mayer, a number of witnesses were called, neighbors, relatives and others, and their testimony for the most part was in line with his opinion that the defendant did not possess normal intelligence, or was feeble-minded. One testified, however, that, in his judgment, the defendant had the mind of a normal man. Evidence was also introduced on behalf of the defendant that, prior to this offense, he had borne a good reputation.

It is contended by counsel for the defense that the defendant is not so insane as to be irresponsible for crime under the test of insanity in force in Pennsylvania, and so is guilty of murder in the second degree, but is suffering from such mental disorder or feebleness of mind as to render him incapable of the "premeditation" or "deliberation" required to constitute murder in the first degree. In support of this proposition, one case cited is People v. Moran (1928), 249 N. Y. 179, wherein the New York Court of Appeals said: "Feebleness of mind or will, even though not so extreme as to justify a finding that the defendant is irresponsible, may properly be considered by the triers of the facts in determining whether a homicide has been committed with a deliberate and premeditated design to kill, and thus may be effective to reduce the grade of the offense." If this is the law in Pennsylvania, then the defendant's evidence was properly admitted for the purpose offered as above stated, and it would remain for us to determine whether this evidence, considering also that of the Commonwealth, should be given the effect urged; that is, whether it is effective to reduce the grade of the offense to murder of the second degree. A comprehensive brief has been submitted, setting forth reasons why we should hold that the doctrine stated in the Moran case is controlling in the case at bar. Cases from other jurisdictions in line with this case are also cited and considered, among which we note: Anderson v. State (1876), 43 Conn. 514; Hempton v. State (1901), 111 Wis. 127; and Hopt v. People (1881), 104 U. S. 631. Emphasis is also laid on the reasoning in the dissenting opinions in two New Jersey cases: State v. Martin (1925), 102 N. J. L. 388; and State v. Noel (1926), 102 N. J. L. 659. These cases and many others are considered in a learned discussion covering the proposition now under consideration, entitled "Partial Insanity and Criminal Intent," by Henry Weihofen, Esq., published in Illinois Law Review, issue of January,

1930. It is there pointed out that the rule that feeble-mindedness may be considered in determining whether a defendant had the specific criminal intent required by the crime charged has not been adopted in more than five states, Connecticut, Utah, Rhode Island, Wisconsin and New York. In Pennsylvania the Supreme Court, in Com. *v.* Wireback, 190 Pa. 138, 147, has declared: "The moral guilt of one man, by reason of vicious training or inferiority of intellectual power, may be less than that of another, but the law takes no note of this in fixing responsibility for crime; nor dare it do so, if society is to be protected. . . . (p. 152). From the very nature of the mental disease, there can be no grading of it by degrees so as to accord with a degree in crime. To say that a man is insane to an extent which incapacitates him from fully forming an intent to take life, yet enables him to fully and maliciously form an intent to do great bodily harm without a purpose to take life, is absurd, for the one involves the same test of responsibility as the other—the ability to distinguish between right and wrong. Either the offense of defendant is wholly excused, because the jury is satisfied by the preponderance of evidence of his irresponsibility, or he is guilty, because the evidence fails to so satisfy them. See, also, Com. *v.* Barner, 199 Pa. 335, holding that there is no middle ground which the law recognizes; and Com. *v.* Cavalier, 284 Pa. 311, 320. "No halfway house exists, in a case of this sort, between murder in the first and any minor degree of that crime. Defendant, if sane, 'could coolly deliberate said murder;' if insane, he could neither deliberate nor premeditate, and, consequently, was guiltless of the crime charged, and of any degree of that crime:" State *v.* Halloway (Mo.), 56 S. W. Repr. 734. See, also, Com. *v.* Cooper (Mass.), 106 N. E. Repr. 545. We find our Legislature recognizing quite recently (Act of April 27, 1927, P. L. 431, 433) that one mentally defective may be convicted of murder in the first degree. It is there provided in substance that persons mentally defective and undergoing prison sentences, except upon conviction for murder in the first degree, may be transferred to institutions for mental defectives. It may be suggested that since there are other kinds of first degree murder than that involving the deliberation and premeditation now being considered, for instance, murder committed in the perpetration of arson, therefore, it was of these other kinds of first degree murder that it was contemplated mental defectives might be convicted. But the doctrine urged would seem logically and necessarily to extend to other mental elements than deliberation and premeditation, and one charged with murder committed in the perpetration of arson could show his feeble-mindedness to negative the specific intent required to constitute the crime of arson. As tersely stated in the article in Illinois Law Review, *supra* (page 525) : "It [the doctrine of reduced responsibility] says that defendants too weak mentally to have the specific intent required for the crime must be *acquitted* of that crime, and convicted, if at all, in a lower degree. But if he is also incapable of the intent required by the lower degree of the crime, or if there is no lower degree, then he must be acquitted entirely. But this would set up a new test of insanity as a defense to crime." In Com. *v.* Trippi (Mass., 1929), 167 N. E. Repr. 354, a prosecution for murder, a psychiatrist was asked as to his opinion regarding the mental age of the defendant, on the ground that his mental age was such that he was incapable of premeditation and deliberation. It was held, on appeal, that the answer was properly excluded, the court stating: "Criminal responsibility does not depend upon the mental age of the defendant nor upon the question whether the mind of the prisoner is above or below that of the ideal or of the average or of the normal man, but upon the question whether the defendant knows the difference between

right and wrong, can understand the relation which he bears to others and which others bear to him, and has knowledge of the nature of his act so as to be able to perceive its true character and consequences to himself and to others. Constitutional or other inferiority is not the test of criminal responsibility."

Counsel for the defendant strenuously urges, in line with the dissenting opinions in the two New Jersey cases above cited, that the same reasoning making intoxication effective to reduce the grade of murder from the first to the second degree makes feeble-mindedness or mental defectiveness not amounting to irresponsibility likewise effective. This proposition may be logical, but, in our view of the matter, has not been adopted in Pennsylvania. As stated in the majority opinion in one of the New Jersey cases just referred to, State *v.* Noel, 133 Atl. Repr. 274: "There are many rules of law which are not perhaps logical. They can, from the standpoint of logic, be successfully attacked; yet many of these laws have remained unaltered by statute or decision because they have stood the test of practical trial. Our courts are not schools of logic. They administer the law and the law should not be changed because a case arises in which its application to the facts appears to result oppressively. In every jurisdiction in which the rule that one who consciously commits a crime and knows the difference at the time of its commission between right and wrong has been impaired, personal security and property rights have suffered." In this opinion appears comment not wholly inapplicable to the testimony and argument on behalf of the defendant in the case at bar, to wit, that the argument advanced to dethrone the test of insanity adopted by the courts of that state years ago is that during these years the science of medicine has advanced and those devoting themselves to the study of mental diseases have increased in wisdom and learning to the point that they have demonstrated that the test so long adhered to is obsolete and for it should be substituted either the rule of irresistible impulse or that of permitting the jury to pass upon the question as to whether the defendant is affected mentally, and, if so, either to acquit him or reduce the grade of the crime to murder in the second degree. This argument was not convincing, the former test of sanity being reaffirmed, not because of its antiquity but because it was believed the best yet promulgated. It is apparent that one who is a mental defective, who has criminal tendencies, and who has committed what would be unquestionably first degree murder were he normal, is a lasting social menace. His condition is unlike that produced by intoxication, which is only temporary. All such should be permanently confined either in prison or in a hospital unless other legislative provision shall be made for their permanent confinement. It would seem that the protection of human society should be the controlling idea in dealing with them. Acceptance here of the doctrine of reduced responsibility, as in intoxication cases, urged by the defense, means that after a period of years any such defendant surviving at the expiration of sentence for second degree murder will be turned loose on society. It may be logical, as aforesaid, to do so, but not practical, nor would it be an act of kindness to him.

It is our opinion that under the law of this state the testimony introduced on behalf of the defendant may not be considered for the purpose of reducing the grade of his offense from murder in the first degree to murder in the second degree, and that it is not effective for that purpose. In determining the penalty as between death and life imprisonment, we do consider it effective in leading to the conclusion that the lesser penalty should be fixed.

Some little time after the testimony was taken in this case, but before we had our opinion thereon and our determination written, the warden of the county jail where the defendant is confined made application to us under section 308 of the Act of July 11, 1923, P. L. 998, setting forth in substance that since the testimony had been taken the defendant had developed a serious mental illness necessitating that he be cared for in a hospital for mental diseases. As required by the law aforesaid, we forthwith ordered an inquiry by a commission, appointing two qualified local physicians and a lawyer on the commission. This commission heard considerable evidence as well as the statement of the defendant's counsel, and has now handed us a copy of all the evidence taken, together with a written report of its finding, the evidence taken being made a part of the report. The commission concludes that the defendant is now insane and is a person of criminal tendencies. What the commission means by the word "insane" is not explained. A definition of the word as used before the commission by the defendant's counsel appears in his statement thus: "I do say there is an organic affection of his brain which has affected his mental faculties, and that by reason thereof he is insane." Much of the testimony before the commission is directly in line with that offered on behalf of the defendant in court. We will direct that this testimony and report be filed. The law authorizing this proceeding contains a provision to the effect that we may, in our discretion, summon other witnesses and secure further evidence, and after we have become satisfied that the defendant is insane and have ordered his removal to a hospital, then if he has been arraigned, or is being tried, proceedings against him shall be stayed until his recovery. We do not construe this to mean that we may not at this time file our opinion and finding on the evidence taken and concluded several weeks before the request aforesaid for the appointment of a commission was made. The determination of the degree of crime must be made by the judge who saw and heard the witnesses: Com. v. Staush, 256 Pa. 620. Therefore, considering the uncertainties of life, delayed filing of such determination, in a situation as here presented, could not have been in contemplation in the adoption of the provision above mentioned relative to stay of proceedings. Under the opposite construction the possibility of a situation arising not conducive to justice is apparent. A defendant actually guilty of first degree murder might become in such mental condition after his confession in court and the taking of testimony to determine his degree of guilt, but before the filing by the court of its determination, that in proceedings under this law he would be committed to a hospital for insane criminals. After a period of years he might recover and be returned to the prison from which he was removed for the disposition of the charge against him. The judge who saw and heard the witnesses might not be in office. His determination would not appear. The testimony taken before him could not be used by the court as then constituted in making a determination: Com. v. Staush, supra. It would be necessary to take the testimony again. Important witnesses might be gone. As we view the matter, it is our duty to file at this time our opinion on the evidence taken before us and our determination of the degree of the defendant's crime and punishment.

### Decree.

And now, June 17, 1930, after the examination of witnesses and hearing had in due form of law and upon due consideration, it is now, in open court, the defendant, John L. Scott, and his counsel being present, adjudged and determined that the crime, and the degree of the crime, whereof the said John

L. Scott is convicted by his own confession, is murder of the first degree, and the penalty fixed is imprisonment for life.

From Luke H. Frasher, Uniontown, Pa.