## STATE v. CONVERSE.

No. 2227.   Decided December 13, 1911 (119 Pac. 1030).

1. LARCENY—EVIDENCE—SUFFICIENCY.   Evidence *held* to sustain a conviction of larceny of plumes.   (Page 76.)

2. CONSTITUTIONAL LAW—LEGISLATIVE POWER—RULES OF EVIDENCE. Comp. Laws 1907, sec. 4355, providing that possession of recently stolen property, where the possessor fails to make satisfactory explanation, shall be deemed *prima facie* evidence of guilt, is a valid exercise of the legislature's power.[1]   (Page 76.)

APPEAL from District Court, Second District; *Hon. J. A. Howell,* Judge.

C. H. Converse was convicted of grand larceny and he appeals.

AFFIRMED.

*John E. Bagley* for appellant.

*A. R. Barnes,* Attorney-General, for the State.

STRAUP, J.

The defendant was convicted of grand larceny.   He was charged with stealing forty-one plumes from the store of Lyman Bros. Company, a corporation, at Ogden, on the 19th day of June, 1909.   The manager and employees of the store testified that the forty-one plumes, a sample line, were in the store on the evening of the 19th of June, at about five o'clock, when the store was closed.   The next day, which was Sunday, when they entered the store between one and three o'clock in the afternoon, and looked the stock of plumes over, they found about forty-one of them missing.   As testified to by

---

[1] State v. Potello, 40 Utah, 56, 119 Pac. 1023; State v. Brown, 36 Utah, 46, 102 Pac. 641, 24 L. R. A. (N. S.) 545; State v. Gordon, 28 Utah, 15, 76 Pac. 882.

them, the plumes were unlawfully taken by some one between the hours of five or six in the afternoon of the 19th, and one or three in the afternoon of the 20th. There is no direct evidence to show that the defendant at any time on the 19th or 20th of June was at or about the store, or was even seen in that vicinity.

Another witness for the state, a milliner of Salt Lake City, testified that the defendant, on the 27th day of June, came to her place of business, and, after soliciting and obtaining an order for an electric flat iron, asked her if she desired to purchase some plumes, saying to her that he had purchased some for his "girl," but "had a row with her and didn't give them to her," and that he would sell them cheap. Later he brought and sold to her six plumes for twelve dollars. The witness, afterwards learning of the missing plumes of Lyman Bros. Company, wrote to it, giving information of her purchase. The manager called on her and identified the plumes as those stolen. Several days thereafter the defendant again called and asked the witness if she desired to purchase more plumes, then saying to her that he had a friend in the millinery business at Sandy, a place near Salt Lake City, who was going out of business, and that he had some plumes which he could sell for the same price that he had sold the others. She told him to bring them to her and she would look them over. While he was gone to get them, she telephoned the police officers. The defendant, when he arrived with the plumes, fifteen or eighteen of them, was immediately arrested. To the officers the defendant, as testified to by them, said that he purchased the plumes fom a "hobo looking fellow on the railroad track at Murray," a place near Sandy, "Sunday morning, June 20th, at ten o'clock, who, he first said, had a gunny sack full of plumes, and afterwards said forty-one and that he paid seventy-five dollars for them and was selling them for ten dollars a dozen." The defendant also told them that he had no regular room, and that the night before his arrest he slept at the Belmont hotel at Salt Lake City. On inquiry they did not find his name on the hotel register nor any one about the hotel who could identify

him. They later discovered that the defendant had been rooming at a different place in Salt Lake City. To an officer at Ogden the defendant stated, as testified to by that officer, that "he met a man in Murray, either in a saloon or business house, that I am not positive of, and that this man took him around the corner and sold him the plumes on the street," and that he could prove an alibi by Mr. Craig at whose house he was on the night the officer told him the crime was committed.

The foregoing is, in substance, all the evidence on the part of the state of incriminating acts and circumstances to connect the defendant with the commission of the charged offense.

The defendant testified that he had been living in Salt Lake City for about a year, and was engaged in traveling for different wholesale houses, buying his goods direct from them and selling them to consumers. He also employed and established agents at different places for such purpose. He had an agent at Ogden where the defendant in May had solicited and taken orders. He there roomed and boarded at a Mr. Craig's house, where also his agent roomed and boarded at the time of the alleged larceny. The defendant there also had his trunk containing advertising circulars and other belongings. The defendant, who had not had any settlement with his agent at Ogden for about a month, wrote him that he would be in Ogden to see him on Saturday evening on the 19th of June. He testified that he left Salt Lake City that evening on the Bamberger Road at about six thirty-five, with a suit case containing his night clothes, brushes, collars, cuffs, and some new samples of electric hair curlers just obtained from the Capital Electric Company, which he desired to show his agent, and arrived at Ogden at "something like nine to half past nine;" the train being, as testified to by him, an hour or more late. On his arrival at Ogden he went direct to Mr. Craig's house. The Craigs and the agent testified that he arrived at Craig's house that evening between nine thirty and ten. He remained all night at Craig's and occupied the room with his agent. That evening the agent and the Craigs saw

the contents of the defendant's suit case, and testified that it did not contain anything except his night clothes, etc., and that it contained no plumes. He settled with his agent and remained at Craig's house all the time he was in Ogden, until between one and two o'clock of the afternoon of the next day, when he left, to take the train at two fifteen from Ogden to Salt Lake City. The agent accompanied him to the depot. He had with him his suit case and a package of advertising circulars taken from his trunk at Craig's. He arrived at Salt Lake City about four o'clock. He testified that on his arrival he went to his room, washed, changed his clothes, and strolled out on the street. He boarded a street car to take a ride, and went to Murray. There, as he got off the car and looked around, he saw a man across the street at a band stand in a little grove of trees in front of a schoolhouse selling plumes. There were other persons about the place attending the sale. Several ladies bought plumes and went away with them. The defendant walked up to the man and inquired about the plumes, and was told that they were a "bankrupt stock." He then had twenty-nine plumes left. The defendant asked him what he would take for all of them, and was told seventy-five dollars. The defendant finally bought them for sixty-five dollars. He paid for them and received the plumes. They were in a gunny sack. William H. Newman, a farmer who had lived at Riverton for over twenty years, testified that he was at Murray on the occasion referred to and saw the man with the plumes in a gunny sack, and saw him make sales to several ladies, and saw the defendant buy a number of plumes and pay for them. Frank Clegg, a broker and real estate agent of Salt Lake City, also testified that he was near by and witnessed the sale of plumes to the defendant and to others. The man selling the plumes was described by these witnesses as looking like an Assyrian or a Portuguese. The defendant, after purchasing the plumes, returned to Salt Lake. In canvassing and soliciting orders for other goods, he also sold some of the plumes. He testified he sold some to Mrs. Pow, the milliner. He admitted he told her that he got the plumes for "his girl and had a row with her," but in

effect testified that he made such remarks merely to induce a sale. He also admitted that he did not tell the officers where he roomed at Salt Lake City, and that he did not do so because he was "vexed at his arrest and was hotheaded and angry." He denied that he told the officers that he met the man of whom he bought the plumes in a saloon, and testified that he told them that he bought them from a "Jewish looking fellow" in Murray, who had them in a gunny sack.

The state, in rebuttal, showed by the conductor's train register that the train which left Salt Lake City at six thirty-five p. m. on the 19th day of June arrived at Ogden on time, at eight o'clock p. m.

The principal assignment of error relates to the question of sufficiency of the evidence to support the verdict. The only evidence tending to connect the defendant with the commission of the crime is his possession of the plumes and his statements in respect thereto. This, the state contends, though circumstantial, yet was sufficient to connect the defendant with the commission of the offense, and hence was sufficient to support the verdict. In support of such contention,       1, 2 it relies on the statute (Comp. Laws 907, section 4355), which, after defining larceny, provides that "possession of property recently stolen, where the party in possession fails to make a satisfactory explanation, shall be deemed *prima facie* evidence of guilt." In the case of *State v. Potello,* 40 Utah, 56, 119 Pac. 1023, just decided, we had occasion to consider this statute at some length. What we there said need not here be repeated. We there held the statute valid and that a *prima facie* case of guilt under the statute arose upon the proof of the larceny, recent possession in the accused, and his failure to satisfactorily explain or account for his possession. That is, that the legislature declared that the proof of such facts was presumptive evidence of the further essential fact that the accused feloniously took and carried away the property from the possession of the owner—that it was he who committed the proved larceny. Here the state proved the larceny, not by mere inferences, but by direct evidence. It also proved recent possession of the

stolen property in the defendant. It also proved that the defendant, in explanation of his possession, made contradictory statements with respect to it. It proved that when he sold the first plumes to the milliner he said that he had purchased them for "his girl," and had a "row with her." When he offered to sell others to the milliner, he stated that he had obtained, or could obtain, them from a friend in the millinery business at Sandy who was going out of business. To the officers at Salt Lake City he stated that he had purchased them at "ten o'clock a. m., June 20th," from a "hobo" on the railroad track at Murray, who there had them in a gunny sack and offered them for sale. To the officers at Ogden he stated that he met a man in a store or saloon at Murray who "took him around the corner and sold him the plumes on the street." Such contradictory statements were quite sufficient to show that his explanation of the possession of the property and his manner of obtaining it was not "satisfactory." Undoubtedly, the state, under the statute, proved sufficient facts to give rise to the inference or presumption that the defendant unlawfully and feloniously took and carried away the property from the possession of the owner, that it was he who committed the proved larceny; hence the state made out a *prima facie* case of guilt. Not, and as we said in the Potello Case, that the jury upon such proven facts were required to convict if they, upon the adduced evidence, were not convinced of his guilt beyond a reasonable doubt; but that a conviction upon such facts, when unrebutted or not discredited by circumstances, would be sufficiently supported by evidence.

There being no direct evidence of the state to show a taking by the defendant—that is that it was he who was the thief—and that fact resting wholly upon the indirect evidence tending to raise a presumption or an inference, did, now, the defendant, by direct evidence, so clearly rebut or discredit that presumption or inference that the jury were not authorized to longer give it any evidentiary effect or sufficient effect to justify a finding of the felonious taking by him? The rule, independently of statutes, obtains in many

jurisdictions, and the doctrine is maintained by Lawson, in his work on the Law of Presumptive Evidence (2 Ed., p. 599), that proof of the larceny and recent possession of the stolen property raises a presumption that the possessor is the thief; whether sufficient, if unrebutted nor discredited, to convict, the authorities divide. But he also maintains the doctrine, and supports it by numerous cases (page 604), that a reasonable explanation by the accused of his possession overthrows the presumption and casts the burden on the prosecution to prove its falsity. This is on the familiar doctrine that a mere presumption cannot prevail against, nor contradict or overcome, direct proof of the fact (Lawson, p. 659), and that a rebuttable presumption of law contested by direct proof of facts showing otherwise loses its value, unless the evidence is equal on both sides, in which case it may have the effect to turn the scale (Lawson, p. 660).

That, too, is the effect of our holding in a well-considered opinion by the present Chief Justice in the case of *State v. Brown*, 36 Utah, 46, 102 Pac. 641, 24 L. R. A. (N. S.) 545. In that case the state contended that the rebuttable presumption of law as to sanity had an evidentiary or probative value which was not dissipated or overthrown by the defendant's undisputed direct proof of insanity, and that the state was entitled to have it cast in the scale and weighed by the jury against the defendant's direct proof of insanity. But we held against the state on such a contention by holding that the presumption of sanity ceased to have any evidentiary value as against the defendant's direct and undisputed proof of sanity; and, since the fact of insanity was clearly established by direct and undisputed proof, we held that there was no legal evidence in the case to justify a finding of sanity by the jury. Undoubtedly, independently of a statute giving rise to it, the presumption with respect to guilt arising from the proof of the larceny and recent possession in the accused is one of fact and not of law. And it would be error in such case to charge that there was a legal presumption of guilt arising from such facts, or that the law presumed guilt from them. (25 Cyc. 134.) Of course, the

trier of fact may, on the proven facts, draw an inference of another existing fact essential to guilt, for, logically and argumentatively, the inferred fact of unlawful taking by the possessor bears a natural relation to such proven facts. But the legislature here by statute has declared that the proven facts of the larceny, recent possession in the accused, and his failure to satisfactorily explain his possession, "shall be deemed *prima facie* evidence of guilt," presumptive evidence of guilt. That is, from such proven facts, the further fact essential to guilt, the felonious taking by the accused, is presumed. The presumption derives its force, not from logic or argument, but from jurisprudence, and is arbitrary in its application to all cases of such proven facts, and hence is properly called a rebuttable presumption of law. (Wharton, Crim. Ev. [9th Ed.], section 714; Lawson, 661.)

As shown in the Potello Case, the legislature may declare that from certain facts another substantive fact essential to guilt may be presumed. It, of course, may not declare such facts conclusive of guilt, or of the presumed fact, and require a conviction if, in the judgment of the court or jury, the ultimate fact of guilt is not satisfactorily established. That would be an encroachment upon the prerogatives of the judiciary. The legislature may prescribe rules of evidence and methods of proof, but it may not direct or control the decisions of the judiciary. There being no direct evidence of the taking by the defendant, and, as already observed, this fact arising only on the rebuttable presumption of law referred to, if, therefore, the presumption itself was controverted by undisputed direct evidence and was overthrown or dissipated, and for that reason no longer had any evidentiary value, then there is no evidence to show a taking by the defendant—to show that he committed the proved larceny. In determining the question of whether the presumption was or was not overthrown, what functions properly belong to the court and what to the jury? If the direct evidence controverting the presumption is *not conflicting nor uncertain, if reasonable minds may not differ with respect to the conclusion to be deduced therefrom,*

then undoubtedly the question is for the court. The jury, in such case, could not be permitted to disregard such direct evidence, or, as against it, base a finding of the fact upon the mere presumption. If, on the other hand, the direct evidence with respect to the presumed fact is itself in conflict or is uncertain, or if reasonable minds may differ with respect to the conclusions to be deduced from the direct evidence, that is, if there is some direct evidence in support of the presumption and some against it, or if the direct evidence claimed to be against it is uncertain, or open to different conclusions, then the question of whether the ultimate fact should be found in accordance with the presumption or against it is for the jury. That is, if the jury on the conflicting or uncertain evidence find the fact consistent with the presumption, of course the presumption still prevails; if they find it otherwise, it disappears. It is for this reason that courts generally have held that, "when one is found in possession of recently stolen property and gives an explanation of his possession which seems reasonable to the jury, the possession ceases to have any evidentiary value and raises, either alone or in connection with other circumstances, no presumption of guilt; if the crime is proved, it must be done by other evidence altogether. If, however, the explanation of his possession given by the defendant was in itself, or in connection with the circumstances, improbable, the prosecution need not disprove it." (25 Cyc. 136, and cases there cited.) To that effect is, also, the case of *State v. Gordon,* 28 Utah, 15, 76 Pac. 882. That does not mean that the question of whether the explanation was or was not reasonable or satisfactory is always for the jury. They cannot be permitted to say that an explanation which is apparently reasonable or probable or truthful is unreasonable or improbable or untruthful, in the absence of evidence or circumstances to justify such a conclusion. They may not in a criminal case, any more than in a civil case, arbitrarily or capriciously disregard or reject evidence or refuse to consider it. (*People v. Mock Yik Gar,* 14 Cal. App. 334, 111 Pac. 1039.) If the evidence with respect to the explana-

tion is uncertain, or is in conflict, or is open to different con-
clusions, or is in itself improbable or doubtful, or, as is
often said, if reasonable minds may differ with respect to the
conclusion or inference to be drawn from it, the question
is one for the jury. If, on the other hand, the evidence with
respect to it is consistent with innocence, is in itself reason-
able and probable, and bears no mark of suspicion or fabrica-
tion, and is not contradicted by evidence other than the mere
presumption referred to, then the jury may not disregard
such evidence and determine the fact upon the mere pre-
sumption.

The state has cited us to cases where courts held on the
particular facts that the question of whether the explanation
was reasonable or satisfactory or otherwise was for the jury.
It has referred us to the case of *State v. Brown,* 25 Iowa,
566; but in that case the court observed that "the circum-
stances were strongly inculpatory of the defendant, and his
conviction does not rest alone upon the presumption of guilt
arising from his very recent possession of the property."
In the case of *State v. Marshall,* 105 Iowa, 38, 74 N. W.
763, the court held that the explanation "was on its face in-
credible and suspicious." In *State v. King,* 122 Iowa, 1,
96 N. W. 712, the explanation "bears earmarks of fabrica-
tion." In *McMahon v. People,* 120 Ill. 581, 11 N. E. 883,
there was direct evidence of the taking by the accused. In
*Thompson v. State* (Tex. Cr App.), 41 S. W. 638, the ques-
tion did not arise on the trial, but on an application for a new
trial on the alleged claim of newly discovered evidence.

In this case, to disprove or dissipate the presumption of
the felonious taking by the accused arising upon the proved
facts referred to, he testified that he did not take the plumes,
and that he was not at or about the building in Ogden and
from which the plumes were stolen, and that he purchased
them at Murray on the next day after the alleged larceny
from an Assyrian or a Jew who had them in a gunny sack,
and who there exhibited them for sale on a Sunday evening
in front of the schoolhouse. Perhaps such an occurrence
or transaction upon uncorroborated testimony of a defend-

ant may be said to be so unusual, or improbable, that a jury might be permitted to say that the explanation of his possession was unreasonable or unsatisfactory, even though no evidence was given by the state to disprove it. But surely a jury in such case would be justified in so regarding the explanation when his testimony with respect to such a transaction is considered in connection with his own contradictory statements as here made by him to the milliner and to the officers. But it is strongly urged that the testimony of the defendant as to that transaction and his manner of obtaining possession of the plumes is corroborated by two disinterested witnesses, Newman and Clegg, strangers to the defendant, and who were in no particular impeached or discredited, and who testified that they, on the day after the alleged larceny, saw the Assyrian at Murray in front of the schoolhouse there exhibit and offer for sale plumes from a gunny sack, and that the defendant and others then purchased plumes from him. They were positive with respect to the place, the day, the parties, and the transaction. It certainly was testimony of great weight tending to overthrow the presumption of a taking of the property by the defendant from the store at Ogden and from the owner's possession. If that testimony were undisputed, if the evidence with respect to that transaction as testified to by these witnesses were not in conflict, we would not permit this verdict to stand. But against that testimony are the statements of the defendant himself made by him to the milliner and to the officers. Of course, the defendant should not be convicted because he may have told an untruth to the officers or to the milliner. He should only be convicted on proof that he committed the larceny. But those statements did not merely serve the purpose of impeachment and to affect credibility, and are not to be considered for that purpose alone; they are also in the nature of admissions by the defendant of facts relating to his possession and the manner of obtaining it.

So, also, is it contended that the presumption was dissipated by the testimony of the defendant that he, on the evening of the 19th, left Salt Lake City at six thirty-five

o'clock p. m.; that because the train was delayed he did not arrive at Ogden until about nine or nine thirty o'clock; and that, by his testimony, and that of his agent and of the Craigs, he arrived at Craig's between nine thirty and ten o'clock and remained there until his departure for Salt Lake City at 2:15 p. m. the next day. But the state proved that the train on which the defendant testified he went to Ogden was not delayed, and that it arrived on time at eight o'clock. According to that, the defendant was in Ogden an hour and a half or two hours, a period of time unaccounted for, before he went to the Craigs.

In view of these considerations, we cannot say, as matter of law, that the presumption was dissipated, and are therefore of the opinion that the evidence is sufficient to support the verdict.

The judgment of the court below is therefore affirmed.

FRICK, C. J., and McCARTY, J., concur.