STATE OF UTAH, Respondent, v. ARTHUR BROWN, Appellant.

No. 1998. Decided June 10, 1909 (102 Pac. 641).

1. Criminal Law—Review—Harmless Error—Evidence. Where, in a criminal prosecution, it is sufficient to prove a corporation *de facto*, and it is so proven, it is harmless error to admit, as part of the evidence of corporate existence, articles of its incorporation not authenticated as required by the statute. (Page 48.)

2. Criminal Law—Appeal—Verdict—Conclusiveness. Where there is any substantial evidence to support a verdict in a criminal case, the appellate court cannot interfere. (Page 55.)

3. Criminal Law—Presumption of Sanity. The presumption that an accused is sane is a presumption of fact, which prevails, unless overcome by countervailing proof. (Page 55.)

4. Criminal Law—Presumption of Sanity—Burden of Proof. The burden of overcoming the presumption that an accused is sane rests primarily on the defendant, and he is required to overthrow it by preponderance of the evidence offered in the case upon the subject; but, when he had overcome this presumption, the state must then establish his sanity beyond a reasonable doubt as bearing on the question of intent. (Page 55.)

5. Criminal Law—Sanity of Accused—Test. The test of insanity as a defense to a criminal prosecution is whether defendant, at the time of the offense, had the mental capacity to know that in doing the act he was doing wrong. (Page 58.)

6. Criminal Law—Review—Questions of Fact. Though an appellate court will not pass upon the weight of evidence in a criminal case, it will determine whether the jury have entirely ignored the evidence. (Page 58.)

7. Criminal Law—Insanity—Criminal Intent. An insane person cannot legally be guilty of a criminal intent. (Page 59.)

8. Criminal Law—Insanity—Weight and Sufficiency of Evidence. In a prosecution for forgery, the evidence of defendant *held* to show conclusively that he was insane, and to completely overcome the presumption of sanity, so as to leave a verdict of guilty without any evidence to sustain it. (Page 59.)

9. CRIMINAL LAW—SETTING ASIDE VERDICT—DUTY OF THE COURT. Under section 4895, Comp. Laws, 1907, the jury having either misunderstood the instructions, or wholly disregarded the evidence the court should have required them to reconsider their verdict, and if they had refused so to do the court should have then set it aside. Where the jury have either misunderstood the law, or entirely ignored the evidence upon a material issue, the trial courts should, without hesitation, exercise the supervisory power over verdicts which the law has wisely conferred upon them. (Page 59.)

APPEAL from District Court, Third District; *Hon. George G. Armstrong*, Judge.

Defendant was convicted of forgery and appealed.

REVERSED AND NEW TRIAL GRANTED.

*Powers & Marioneaux* for appellant.

*A. R. Barnes*, Attorney-General, for the State.

RESPONDENT'S AUTHORITIES.

It was sufficient for the state to prove a *de facto* corporation. This is undoubtedly the law. (*People v. Hughes*, 29 Cal. 257; *People v. Ah Sam*, 31 Cal. 645; *People v. Barrie*, 49 Cal. 342; *State v. Thompson*, 23 Kan. 338, 33 Am. Rep. 165; *U. S. v. Amedy*, 11 Wheat. 392; *Reed v. State*, 15 Ohio Rep. 217; *State v. Pittam* [Wash.], 72 Pac. 1042.) The fact that the company was incorporated became material only as a matter of description, and that it was not an element of the crime. The case is widely different where a suit is pending in which the legal existence of the corporation may be made an issue. (*U. S. v. Amedy, supra*; *People v. Ah Sam, supra*.)

FRICK, J.,

The appellant was charged, tried, and convicted of the crime of forging and uttering as genuine a certain check. The case was before this court at a former term, and the judgment of conviction for the same offense was reversed. (*State v. Brown*, 33 Utah 109, 93 Pac. 52.)

The first assignment relates to the same error for which the case was reversed on the former appeal, namely, that the trial court erred in permitting the corporate existence of the Utah Apex Mining Company to be proved by admitting evidence that said company was generally reputed to be a corporation. It is insisted that the evidence in this regard was insufficient because it was not shown that said company was reputed to be a corporation in Salt Lake county, where the alleged crime was committed. We are of the opinion that the ruling of the court and the evidence with respect to the corporate existence of said company were within the rule laid down in our former opinion in this case, and hence this assignment must be overruled.

It is also contended that the court erred in admitting in evidence the articles of incorporation of the Utah Apex Mining Company, upon the ground that the said articles were not authenticated as required by our statute. In answer to this it must suffice to say that there was no dispute with respect to the corporate existence of said company. The corporate existence was not assailed in a direct proceeding, and all the state was required to do was to show that the Utah Apex Mining Company was a corporation *de facto*; that is, that it was reputed to be such. Although we should concede that the court erred in admitting the articles of incorporation for the reason contended for by appellant, yet in view that the evidence that the Utah Apex Mining Company was a corporation *de facto* was undisputed, and was in accordance with our statute and in all respects sufficient to authorize the jury to find that said company was a corporation *de facto,* the appellant was not prejudiced by the admission of the articles in evidence. The record does not present a case where the jury might have been misled by alleged incompetent evidence to the prejudice of the complaining party, and hence this assignment must likewise be overruled.

Another assignment is that the undisputed evidence shows that the defendant was insane when the alleged offense was committed, and hence was legally incapacitated to commit a crime. In view of the whole evidence and the somewhat pe-

culiar circumstances of this case this assignment presents
the only serious question in the case. We have given it
much consideration, and are free to confess that we have had
some difficulty in arriving at a satisfactory solution of the
problems involved. At the trial the defendant made no .at-
tempt to deny or explain the acts charged as constituting the
offense, but relied solely upon the defense of insanity, while
the state relied entirely upon proof of the acts charged,    •
without in any way attempting to rebut or explain the evi-
dence of insanity submitted on behalf of the defendant.

The evidence against the defendant tended to establish the
following facts: On May 21, 1906, at the time the alleged
was committed, the defendant was in the employ of the Utah
Apex Mining Company as bookkeeper and purchasing agent.
He had been so employed by Mr. W. C. Orem, the general
manager of said company, for about four months prior to
said date. Mr. Orem was business manager or superin-
tendent of several other mining corporations, and the defend-
ant also assisted Mr. Orem with respect to the business affairs
of such other corporations. On the 20th day of May, 1906,
the defendant purchased from a certain stock broker certain
stocks, the purchase price of which amounted to $9562.50,
and paid therefor by giving his personal check to the broker.
On the day following the broker spoke to the defendant about
the matter in the street, and informed him that the bank re-
fused to honor the check for want of funds. The defendant
said that he had omitted to deposit funds, but would do so at
once, and that the matter was all right. In order to make the
deposit defendant went to Mr. Orem's office, and drew a
check for $6125 and signed the check "Utah Apex Mining
Company, by W. C. Orem, Manager," and also made another
check for $3437.50, and signed the name of the Butler-
Liberal Com. Mining Co. thereto. These checks were forth-
with deposited by the defendant, and the bank thereupon paid
his check to the broker. On the same afternoon Mr. Orem
was telephoned to by a certain bank with respect to the But-
ler-Liberal Company's check. The bank, it seems, doubted

36 Utah—4

its genuineness.  Mr. Orem called defendant's attention to the check, and defendant said he knew nothing concerning such a check.  Whether defendant's attention was at that time directed to the Utah Apex Mining Company's check is not clear, but Mr. Orem, on looking over the checkbooks later in the day, discovered the stub for the $6125 check, across which the word "void" was written in red ink.  Mr. Orem also found another stub in the Utah Apex Mining Company's checkbook similarly marked, which was drawn for $5000. In addition to this last check he found a fourth one, but the amount is not given.  All the checks were in the handwriting of the defendant.  It will be observed that the sum of the first two checks amounted to the exact amount for which the defendant's personal check was given as the purchase price of the stock, namely, $9562.50.  It is not made clear whether defendant passed, or attempted to pass, the two checks last above mentioned.  The discovery that the checks were forgeries followed almost immediately after they had been uttered.  When the defendant's attention was directed to the check stubs marked "void," his explanation appears not to have been satisfactory to Mr. Orem.  Defendant, some time in the afternoon, left Mr. Orem's office, and, before his bank closed, also drew $1000 in bills of large denominations; and in the evening he was arrested at the railroad station, intending, as he said, to go to Los Angeles.  At the time of his arrest he had on his person about $970, presumably a part of the $1000 he had drawn from the bank in the afternoon. It also appeared that the defendant had no authority to sign checks, either by himself or by signing Mr. Orem's name thereto; that Mr. Orem was the only person authorized to sign checks, and that the signatures of Mr. Orem to the checks in question were traced or simulated.  It is apparent from the evidence that it was not very difficult for an experienced person to detect the forgeries by a careful inspection of the checks themselves.

The foregoing substantially covers the evidence offered by the state.  As already indicated, the defendant made no effort either to deny or explain the acts charged against him,

but relied wholly on the defense of insanity, in support of which the record discloses the following facts:

Defendant, at the time the alleged offense was committed, was upwards of thirty years of age. He had lived in Salt Lake City for many years, and was well known. He had been employed in responsible positions in banks, and otherwise, for many years, and had always lived at home with his parents and brother and sisters. The testimony is all to the effect that for a period of years before the alleged offense he was more than ordinarily alert in business affairs, and was a very competent business man. The testimony, however, shows that some of his ancestors were insane. His father's grandmother died in an insane asylum in England, and one of his father's grandfathers committed suicide while insane. One of the father's sisters was also insane at one time, and the father himself was afflicted for a number of years with some mental malady. For about two years prior to the alleged offense the defendant exhibited marked signs of mental disturbance or breakdown. It is not practical to set forth even a small part of the testimony of the many witnesses who testified with respect to defendant's mental aberrations. We will therefore content ourselves by giving but a mere outline of what we deem the most salient features of the testimony.

Some time prior to the alleged offense, and during the Russo-Japanese War, the defendant conceived the opinion that the Japanese people were the strongest nation on the face of the earth, and that this was due to the fact that they consumed rice as the principal part of their diet. He, therefore, insisted that his mother and sisters must prepare rice for him, and he would eat but little else. He also seemed imbued with the idea that he knew why some men, and especially the Jews, became rich. He said that this was so because they thought of and talked about money constantly, and hence money came to them; that he thenceforth would think of, talk about, and love, money, and it would come to him as it had to those who did so. From this on he continually referred to money, and said that it could be obtained from the ether or air; that he would in a short time be worth many

millions; that he would draw it from the ether in some way. When remonstrated with by his relatives, he would get vexed, and said he would show them. During this time his mother became very ill, and finally died. On the day of her death, and after being called to her bedside while dying, he asserted that she was all right, that he had hypnotic powers, and that he had hypnotized her. Although he had always been an affectionate son, and had always loved his mother, he seemed to be utterly unconcerned about her death, and refused to assist his brother and sisters in any way during her sickness and after her death. He on various occasions told others that he was making large sums of money; that his ventures and deals amounted to millions; that he had made as much as $100,000 in one day; that they should buy a certain stock; that it would make them wealthy, and at times he would quote its value or price much in excess of what it was actually known by them to be selling for on the market.

In detailing his conduct at the time of, and after, his arrest all the witnesses say that he did not seem to realize that he had done anything wrong; that he would insist in all apparent sincerity that he had done nothing wrong or to be ashamed of, and that his friends and family ought to be proud of him. It is further shown that after his arrest, and before his trial, and even after having been convicted, he insisted that there was nothing to the whole matter; that he "[presumably meaning the officers] had them on the run," or that he "had them under his thumb." After his conviction he said that he "had them now where he wanted them; that they would now have to come to him." It was also made to appear that during the first and the last trial he did not seem to care anything about the matter; that he was wholly indifferent with respect to the result of the case, and when the jury found him guilty, he apparently was oblivious to what had occurred, and that he was in no way concerned.

Some of his lodge members further testified that for some years prior to 1906, when the alleged offense was committed, he arose to the highest position of trust and confidence in the

lodge; that he was always punctual, and ever insistent that his fellow members should obey and follow, not only the rule of propriety, but the rules of morality as well; that for some time prior to the alleged offense he became neglectful of his lodge duties, failed to attend lodge, and when spoken to about it said that he was studying law; that he was the reincarnation of a great lawyer; that he was too busy to attend lodge; that his business ventures were of too much importance, and that he was attending to matters or deals that amounted to millions of dollars. All this was said when his friends knew that he was not studying law, and that he was merely employed at a monthly salary. These acts and conduct appear to have been continual from about 1904 to the time of the last trial. The witnesses, fourteen in number, among whom were business men, lawyers, police officers, county attorney, and court officers, all were of one mind that the defendant, at the time of the alleged offense, was mentally unbalanced, did not know or realize the consequences of his act, and that his state of mind was such that he did not know the nature and quality of the act with which he was charged, and that he did not know or realize that the act was wrong. We do not wish to be understood as intimating that during all of this time the witnesses did not concede that the defendant did and said many things which appeared rational. But they did say that the burden of his conversation, when directed to business affairs, was the getting of money; that is, that he was transacting, or was about to consummate, immense deals by or through which he was to become immensely rich. Some of the witnesses laid special stress upon the incoherent character of his conversations, and upon his apparent inability to think and talk in a connected manner.

Upon the foregoing evidence the court submitted the case to the jury, upon instructions none of which are complained of here. In one instruction the court, in substance, told the jury that the defendant was presumed to be sane, and that the burden of establishing insanity by a preponderance of the evidence was upon him; but, when sufficient evidence

was introduced to overcome the presumption of sanity, then the burden of proof shifted; and, if the jury entertained a reasonable doubt with respect to the sanity of the defendant at the time he committed the alleged offense, or as to whether he was mentally responsible for the acts complained of, then the jury should find him not guilty. The court in other instructions also fully informed the jury with respect to the degree of mental unsoundness which was re-, quired in order to excuse an act; that the unsoundness of mind, in order to excuse an act, must be of such a degree as to leave the accused in such mental state as to deprive him of sufficient mental capacity to know that the act constituting the offense was wrong. The court also told the jury that in order to excuse the act upon the ground of insanity, it was not necessary that the accused should be found to have been a raving maniac, or bereft of all reasoning powers. The instructions as given fairly reflected the law with respect to the defense of insanity as adopted by this court in *People v. Dillon,* 8 Utah 92, 30 Pac. 150. Upon the whole evidence and the instructions as given by the court the jury, nevertheless, found the defendant guilty as charged. Counsel for appellant now urge that, in view of the uncontradicted evidence upon the issue of insanity, the verdict is not supported by any evidence, and is contrary to law.

In view of the fact that the state made no effort to explain or dispute the overwhelming mass of testimony introduced with respect to the defendant's mental condition at the time of and before and subsequent to, the commission of the alleged offense, the question arises: Is there any evidence respecting the sanity of the defendant, except the legal presumption that he was sane? The attorney-general contends that whether this presumption was overcome or not was a question of fact for the jury; and, since they have found against the defendant upon the issue, the finding is conclusive upon this court. It is further contended that this court has held that in criminal cases we cannot disturb the verdict of a jury if there is any evidence to support it, and that the presumption constitutes such evidence. No doubt this court

has repeatedly held that, where there is any substantial evidence in support of a verdict this court is powerless to interfere. (*State v. Halford,* 17 Utah 475, 54 Pac. 819; *State v. Webb,* 18 Utah 441, 56 Pac. 159; *State v. Endsley,* 19 Utah 478, 57 Pac. 430.)

The question as to whether the jury may disregard affirmative evidence tending to establish insanity, and may base their verdict wholly upon the mere legal presumption of sanity, has, so far as we know, never been passed on by this court. No doubt the presumption of sanity in the absence of any evidence to the contrary, makes *prima facie* case in favor of sanity. It is, however, a presumption of fact merely, and prevails unless overcome by countervailing proof. In this jurisdiction the burden of overcoming this presumption rests primarily upon the defendant. He is required to overthrow it, by a preponderance of the evidence offered in the case upon the subject. There, no doubt, may be instances where the evidence offered by the defendant upon the question of his sanity is so weak and inconclusive that the state may well insist upon the presumption of sanity, and thus need not offer any evidence in rebuttal of defendant's evidence upon the question. Can it be said, however, that this is so in all instances because it may be so in some? It seems to us that this case offers a striking illustration that this cannot be so. In this case, as we have pointed out, the evidence of defendant's mental unsoundness before, at the time of, and after the commission of the alleged offense is all one way. It comes from a class of witnesses who had ample opportunities to observe defendant's acts and conduct. Many of them knew him for a long term of years, and thus from time to time noted the change in his mental condition. Moreover, mental unsoundness—that is, insanity—is shown as a part of defendant's family history. The insane temperament is thus shown to have existed. Among the witnesses were men who came in contact with crime and criminals almost daily, and as a part of their official duties, and thus could not be easily deceived. It was also shown that but few of all all those wit-

nesses had any special interest in the defendant. It is not a case where the testimony was limited to the friends of the family or relatives of the defendant who sought to shield the family from disgrace, but it is a case where a large number of witnesses, without any apparent interest or bias, all agree that the defendant before, at the time of and after the commission of the alleged offense was, and continued to be, insane, and that he was mentally irresponsible. Under such circumstances can it be said, with any show of reason, that there is any evidence in support of defendant's sanity?

Counsel for the state contend that the jury were authorized to take into consideration defendant's acts and conduct before and at the time he committed the offense; that in doing what he did his acts seemed rational. In other words, that the defendant acted as others guilty of like acts ordinarily do when he committed the forgeries. Hence the jury were justified in finding him guilty. It seems to us, however, that when his acts are analyzed, they hardly support this contention. On the day preceding the forgeries, the defendant, a mere bookkeeper or clerk, without ready means, so far as the record discloses, makes a purchase of stocks worth nearly $10,000. He gives his personal check for the amount when he had no funds with which to meet the check. In order to obtain funds he has recourse to his employer's checkbooks, and issues checks in a manner that any sane man, acquainted with present business methods, as defendant was, must have known that he would be detected, just as he was detected, in a very short time after issuing the checks. If it had been a transaction of a few dollars only, one would not ordinarily assume that there necessarily was anything wrong with defendant's mind. But when a mere clerk, without funds, buys stock in such large amounts, one naturally ought to inquire into the reason for such a transaction; and, when this is done, there is, there can be, but one reasonable explanation, and that is upon the hypothesis that there must have been something wrong with the actor's mental condition. But if we assume that defendant intended to forge the checks, which he no doubt did, this is not alone sufficient to make an insane

person guilty of a crime. As was well said by Mr. Justice Sullivan, in *Knights v. State,* 58 Neb. 228, 78 N. W. 509, 76 Am. St. Rep. 80; "Such is not the law. . . . Ordinarily insane persons comprehend the nature of their acts. When they take life or destroy property, they usually know what they are doing, and often choose means singularly fitted to accomplish the end in view." The true test is whether the defendant, at the time of the commission of the offense, had the mental capacity to know that in doing the act he was doing wrong. As was said in *Hawe v. State,* 11 Neb. 537, 10 N. W. 452, 38 Am. Rep 375: "And where an individual lacks the mental capacity to distinguish right from wrong, in reference to the particular act complained of, the law will not hold him responsible."

The jury in this case either misunderstood the court's instructions, or misapplied them to the evidence, or wilfully or inadvertently disregarded all the evidence upon the question of insanity. While we disclaim any right to pass upon the weight of the evidence in either criminal or civil law cases, we nevertheless may not ignore the duty of determining whether the jury have entirely ignored the evidence, and for that purpose may scrutinize the evidence to ascertain whether there is any evidence in support of a material issue essential to a conviction. In this case the only defense was insanity. The state was, nevertheless, required to prove every essential element constituting the alleged offense. True, the state in the first instance was not required to adduce any evidence that the appellant was sane, since the presumption of sanity made a *prima facie* case upon that issue. But after the appellant by an overwhelming mass of evidence, had rebutted the presumptions of sanity, the jury were not authorized to arbitrarily disregard the evidence of insanity, all of which was, in effect, conceded by the state to be true, and make a finding in favor of the state, based upon a presumption which had been entirely overcome. When this presumption was overcome, there was absolutely no evidence to support the verdict, for the reason that, apart from the presumption of sanity, the evidence upon this issue is all one way, and is clearly

to the effect that appellant was insane. The presumption was therefore overcome, beyond any doubt. Upon this question there is no room for reasonable men to differ. We venture the assertion that no one who is unbiased can read the record in this case without arriving at the same conclusion.

It is, however, asserted that the presumption still is sufficient evidence to support the verdict. As we have already pointed out in this jurisdiction, it is the duty of the defendant to bring the defense of insanity into the case. Unless he produces sufficient evidence of insanity to overcome the presumption of sanity, the presumption prevails. While the defense of insanity may thus perhaps not be characterized as an affirmative defense, because it is included within the plea of not guilty, a mere negative, yet it partakes of that nature, for the reason that unless the defendant produces evidence in support of it the state may rely upon the presumption alone, and this presumption is, in and of itself, sufficient, unless it is overcome by sufficient affirmative evidence. It is for this reason that many of the courts, including this court, have held that the burden of proof upon this issue is upon the defendant. When the cases are analyzed, however, it will be found that the difference among the courts (except in a few jurisdictions) is one more of phraseology than of substance. It may be said that it is the duty of the defendant to make the first move with respect to this defense, and in that way, because the evidence, apart from the presumption, upon the issue of insanity must preponderate in favor of insanity, the burden of proof, as it is called, is cast upon the defendant, and not otherwise. When, however, he has offered sufficient competent evidence to overcome this presumption, the state must, nevertheless, establish his sanity beyond a reasonable doubt, for the reason that, whenever intent is an essential ingredient of the crime charged, this intent, to constitute the act a crime, must be shown.

An insane person cannot legally be guilty of a criminal intent. By the defendant's proof of insanity the presumption of sanity failed, and the legal capacity to commit

crime was thus lacking; and, unless the state by some competent evidence met the evidence upon the part of the defendant upon this issue, there was no evidence in support of the verdict of the jury, in which the capacity to commit a crime was necessarily included. If the state of the evidence upon the issue of insanity had been such as to permit reasonable men to arrive at different conclusions when considered in connection with the presumption of sanity, then the question would be one of fact merely, and we would be powerless to interfere. But such is not the case. The evidence upon the issue of insanity, including the presumption of sanity, admits of but one conclusion. Therefore the defendant established the defense of insanity as a matter of law. To hold otherwise would lead to the absurd result that the presumption of sanity is either a conclusive presumption, or that it becomes so when a jury arbitrarily disregards all evidence in opposition thereto. We are not prepared to announce any such doctrine, notwithstanding the fact that it may be easier for us to submit to a verdict of a jury than it is to assign reasons why we are unable to do so. While we have neither the power nor the inclination, if we had the power, to interfere with the province of a jury in passing upon facts, we nevertheless cannot yield our assent to a verdict which is not supported by any substantial evidence and is in plain disregard of law.

In conclusion we desire to add that in view of this record the trial court, before receiving the verdict, should have directed the jury's attention to the fact that they had either misunderstood the instructions, or had wholly disregarded the evidence, and the court should have required them to reconsider their verdict, as provided by section 4895, Comp. Laws 1907, the provisions of which were intended to cover cases like the one before us. If the jury had refused to reconsider the verdict, the court should then have set it aside. While verdicts of juries are not to be set aside or interfered with for trivial or insufficient reasons, yet where it is clear that the jury have either misunderstood the law, or entirely ignored the evidence upon a material issue, the

trial courts should, without hesitation, exercise the supervisory power over verdicts which the law has wisely conferred upon them. A failure to exercise this power may, under certain circumstances, be as prejudicial to a party as an abuse of the power could possibly be. Moreover, in most instances, an abuse of the power is easier to rectify than is the failure to exercise it. While it is necessary that crime should be punished, and society protected against criminals, yet when it is clearly made to appear that a person has been illegally convicted, the conviction should not be permitted to stand. This is especially true when it is made to appear that the accused was insane when the alleged offense was committed. To convict a sane man who is innocent is deplorable, but to sentence an insane man to the penitentiary for a crime that he did not have mental capacity to commit would be intolerable. To concede that the law is impotent, and the courts powerless to avoid such a result, is a concession that we are not prepared to make.

The judgment is reversed, and the cause remanded to the district court, with directions to grant defendant's motion for a new trial.

STRAUP, C. J., and McCARTY, concur.