Marmion POLLARD, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 13901.

United States Court of Appeals
Sixth Circuit.

June 27, 1960.

As Amended Oct. 4, 1960.

Rehearing Denied Oct. 6, 1960.

Kermit G. Bailer, Detroit, Mich., for appellant.

George E. Woods, Chief Asst. U. S. Atty., Detroit, Mich., Fred W. Kaess, U. S. Atty., and George E. Woods, Asst. U. S. Atty., Detroit, Mich., on the brief, for appellee.

Before McALLISTER, Chief Judge, SIMONS, Senior Circuit Judge, and BROOKS, District Judge.

McALLISTER, Chief Judge.

Marmion Pollard, in April, 1956, had been for several years a member of the Detroit Police Department. He was an apparently well-adjusted, highly intelligent Negro officer on the force, of an active nature, pleasing personality, and happy disposition. His rating as a member of the Police Department was excellent, and his intelligence quotient, as appeared from the examination of the Department, was very high. He was married and had four children. He was a good husband and father and had never been in any trouble. He left a Detroit high school, where he was a good student, when he was in the twelfth grade, to enlist in the Navy, earning, after his full service there, an honorable discharge.

In April, 1956, while he was on police duty, his wife and small daughter were brutally murdered in their home by a drunken neighbor. After the murder, Pollard's three other children, all sons, continued to live with him and his mother-in-law, who cared for the children and the home. Gradually, Pollard became the victim of chronic depression or melancholia, appearing generally, to be overcome with fatigue, bursting into tears and crying and sobbing for considerable periods, and repeatedly threatening to commit suicide with his police gun. He continued his duties with the Police Department, but, to his fellow officers, he seemed always overcome by fatigue. Where he had appeared gay, smiling, and good humored, before the murder, he afterward was silent, morose, and expressionless, appearing for long periods not to hear questions addressed to him. His brother-in-law on one occasion prevented him from deliberately running onto a thru-way, where he probably would have been killed by swift-moving cars. On another occasion, his brother-in-law found him lying on the floor in his home, sobbing; his body was so limp he could hardly be lifted to the bed. After many of these incidents, Pollard seemed to recover and would become suddenly cheerful with no memory of what had happened.

A little more than two years after the murder of his wife and daughter, Pollard

remarried, on May 22, 1958. On the day before this marriage, Pollard attempted to hold up a branch of the Detroit Bank & Trust Company about eleven o'clock in the morning. With a gun, he threatened the teller, ordering her to fill up a paper bag with money. The teller did so and handed the bag to Pollard, who ordered a bank official to accompany him to the exit. As they approached the door, the official suddenly threw his arms around Pollard, who then dropped the bag of money and ran out of the building.

On the afternoon of the same day, about 4:00 P. M., Pollard attempted to hold up a branch of the Bank of the Commonwealth. He walked to a railing behind which a bank employee was sitting and pointing his gun at him, told him to sit quietly. The employee, however, raised an alarm and Pollard ran out of the bank. After having held up two banks in one day and failed in the robberies, Pollard then planned on the same afternoon to rob a third bank, but finally decided not to do so when, as he said, he found it had too much window area, and felt that the chance of his being caught was too great. However, a few days later, on June 3, 1958, he entered another bank to attempt a hold-up. He went to an enclosure behind which two employees were sitting and with his gun, ordered one of them to come from behind the railing. As the employee arose, Pollard thought that she might have pushed an alarm button. He then ordered her to accompany him out of the bank, telling her to walk ahead of him. When they got outside, Pollard ran across an empty lot to his car and escaped. A week later, Pollard attempted to hold up a grocery market, but when the proprietor screamed, Pollard ran out of the building, leaving his car in the rear of the market. The car was placed under police surveillance, and later, when Pollard, who had changed to his police uniform, came to get the car, he was arrested by detectives of the Detroit Police Department. After his arrest, Pollard seemed greatly relieved, and con-

fessed to eleven other attempted robberies, or robberies.

On his arraignment, Pollard, at first, pleaded guilty. Later, the court, on motion of Pollard's counsel, set aside the guilty plea; a plea of not guilty was entered; and trial proceeded before the District Judge, a jury having been waived. The defense was that appellant, at the time of the acts charged, suffered from a defect of mind, denominated by psychiatrists, as a disassociative reaction, and that he committed the attempted robberies under the compulsion of an irresistible impulse. After hearing the testimony of three psychiatrists, the District Court ordered appellant to be committed to the United States Medical Center for Federal Prisoners, at Springfield, Missouri, for a period of not exceeding thirty days, for examination, study, and report as to his mental condition. The conclusions of the three psychiatrists who had examined appellant were made available to the Medical Center, and after a neuro-psychiatric examination, the appellant was returned to Detroit with an accompanying report.

Prior to being committed for examination and study to the United States Medical Center, appellant, as above stated, was examined by three psychiatrists: Dr. Milton R. Palmer, Dr. Alfred C. LaBine, and Dr. Herbert Alfred Raskin.

Dr. Milton R. Palmer, a psychiatrist, called on behalf of appellant, supported the defense that Pollard at the time of the conduct charged against him, was suffering from a disassociative reaction and that he acted under the compulsion of an irresistible impulse. In arriving at his conclusion, Dr. Palmer had been assisted by a psychiatric team, including Dr. Papano, a psychologist of the Veterans Administration, and Mr. Duncan, a psychiatric social worker of the Mental Hygiene Clinic of the Veterans Administration.

The government, then, voluntarily, and in a most commendable effort to submit to the District Court all evidence that it had obtained bearing upon appellant's claimed irresistible impulse—even

contrary to its own theory and contentions—introduced the testimony of two experts in psychiatry, Dr. Alfred C. LaBine and Dr. Alfred Raskin. They agreed with appellant's witness, Dr. Palmer, and testified that, in their opinion, appellant had acted under an irresistible impulse when he attempted the robbery of the banks. The testimony of Dr. Palmer, Dr. LaBine, and Dr. Raskin was detailed and comprehensive, extending over many pages of the record. At the conclusion of this testimony, the

District Court, as above mentioned, committed appellant for study and examination to the Medical Center for Federal Prisoners.

On November 6, 1958, the report of the Neuropsychiatric Staff Conference of the Medical Center was completed. The neuropsychiatric examination was made by Theodore Anderson, M. D., the staff psychiatrist.

In his report,[1] Dr. Anderson diagnosed Pollard as manifesting "an acute anti-

1. The report goes on to state that Pollard had been committed to the Medical Center "in order that a psychiatric evaluation of his competency to stand trial and his responsibility at the time of the offense might be made. He has been examined by two court-appointed psychiatrists who agree that he is competent to stand trial and that in their interpretation of the law he could not be considered criminally responsible for the offenses with which he is charged. * * Sources of Information: 1) The patient, who is considered reliable, and 2) The official record which contains an extensive pre-sentence report along with the reports of the two court-appointed psychiatrists and extensive information about the crimes themselves. These reports are all considered reliable. * * * * The patient was born and raised in Detroit in a comfortable residential area and he had no unusual problems during childhood. He attended school and maintained a 'B' average, participated in extracurricular activities, and the school social life. During the 12th grade, when he became 17, the patient enlisted in the Navy because he felt for a long time that he wanted to be a 'sailor' and was honorably discharged about two years later, not having had any difficulties. He returned to Detroit and progressed through a series of *moderate term employment* during the next three years. One year after he returned to Detroit, he married his first wife and two years later joined the Detroit police force. During the next four years, four sons and a daughter were born to this apparently happy and reasonably successful family. [This was a misstatement. Pollard had three sons and one daughter.] The patient states he endured some financial stress early in his married life, but they had overcome this and were on the verge of buying a house. At this point, in April, 1956, his wife and daughter were killed in an unprovoked attack by a neigh-

bor. At this point the patient underwent what could be described as a depressive reaction. From the information obtained it seems that this reaction was within appropriate limits and without more malignant symptoms such as thoughts of suicide, severe guilt feelings, etc. The patient remained depressed and withdrawn despite efforts of his friends to include him in activities and despite his own efforts to keep occupied with his police force job. Three months after his wife's death he met his second wife who was at that time obtaining a divorce. They supported each other during their emotional stress periods and during the course of the next several months decided to get married. During this time it was noted by his supervisors that he became less efficient, less interested, more withdrawn, and a noticeably less effective policeman. He continued his relationship with his present wife and they planned to get married in the springtime as soon as they could find a suitable place to live. Toward the end of March he committed his first armed robbery and during April this was repeated twice. During May he robbed a beer store, then two days before his marriage robbed two finance companies, and on the day before his marriage, a grocery store and two banks. On the day of his marriage he robbed another grocery store, and shortly thereafter another one. During June he robbed another bank and two grocery stores and was finally apprehended on 6–11–58. He is being charged only with the three bank robberies.

"The patient describes the robberies essentially as follows: Detroit policemen are required to carry their guns at all times so he always had his with him. He would be driving down a street for any incidental reason and would see a grocery store or finance company. He would park his car and in an unpremeditated fashion, without 'casing' the place, he would enter the establishment

social reaction pattern in a patient without evidence of serious underlying personality defects and whose prior behavior had been consistently social, well integrated, and constructive. There is further suggestive evidence that at the time of the eruption of his acute antisocial symptoms, there was a disassociative type of psychoneurotic reaction, although the evidence is insufficient to permit an adequate psychodynamic formulation." In the foregoing, it is admitted by the government that the diagnosis of suggestive evidence of a disassociative type of psychoneurotic reaction is evidence tending to support the testimony of the three psychiatric witnesses who testified in court.

The foregoing report of Dr. Anderson was concurred in and approved by Dr. Joseph C. Sturgell, Chief of the Neuropsychiatric Service, Dr. Louis Moreau, Deputy Chief of the Neuropsychiatric Service, and Dr. Russell O. Settle, Warden and Chief Medical Officer of the Medical Center for Federal Prisoners. Their conclusions were embodied in the Report of the Neuropsychiatric Staff Conference of the United States Medical Center for Federal Prisoners at Springfield, Missouri.[2]

---

and attempt to scare the manager with his gun. He states that he knows how to use a gun well and was not afraid of its going off either accidentally or intentionally, since he had no intention of harming anyone. He reports that he knew it was wrong at the time but could not stop. He would feel no striking emotion at the time, no fright, anxiety, joy, nor regret. * * * He reports that he had only one incident which scared him when a bank manager grabbled with him and he became afraid that someone might get hurt in the tussle. In other respects his life was continuing on in a normal fashion and his associates were unaware that anything extraordinary was taking place with this patient. After his last attempted robbery, he left the scene, walked one or two miles home, and returned to pick up his car near the scene while it was under surveillance. It was in this manner that he was apprehended. After he was arrested he states that he has felt better than he ever has since his first wife died. He feels very relieved but he doesn't know what from.

"Neurological & Mental Status Examination: A neurological examination was essentially normal and no special studies were performed. Detailed psychological examination has not, to date, been performed.

"The patient enters the examining room in a friendly, willing, courteous, and spontaneous manner and relates the incidents surrounding his experiences in a spontaneous, correlated, goal directed, apparently reliable fashion. He gives no evidence of sensory or perceptual losses or distortions such as hallucinations or delusions. * * * His general level of intelligence is estimated at the high normal to superior level which is commensurate with a reported I. Q. of 119.

His fund of general information is commensurate with this and with his high school education. * * * There is currently no evidence of psyschosis or severe personality disintegration."

2. The Report of the Neuropsychiatric Staff Conference stated that Pollard was examined by the three psychiatrists heretofore mentioned, and also took into consideration Dr. Anderson's report, the reports of previous psychiatric examiners, the findings of psychological tests, physical and laboratory examinations, the descriptions of his behavior submitted by the United States Attorney and others during the period of March, April, and May of 1958, and the results of the observation of his behavior and adjustment during his twenty-five days of confinement in the Medical Center. The Report further stated: "An attempt to evaluate his mental condition during the period March through May of 1958, during which he is alleged to have committed a series of armed robberies, leads us to the conclusion that the weight of objective historical evidence available to us tends to support the conclusion of previous examiners. Certain of the current findings, particularly the psychological test results, the blandness of affect, and the subsequent flight into mild religiosity, hint of the presence of a latent schizophrenic process in this subject. The reactive depressive symptoms described as following the murder of his wife and their infant child in 1956, his slow recovery therefrom, the subsequent very bizarre and ineffectively planned and executed series of robberies, and the emotional ease and relief of tension following arrest, viewed in the light of the above suggestive findings, indicate that during that period a dissociative state may have ex-

In this case, therefore, it appears that six psychiatrists, a psychologist, a psychiatric social worker, and the Chief Medical Officer of the Medical Center for Federal Prisoners, including all of the expert witnesses, both for the government and appellant, were either of the opinion that appellant acted under an irresistible impulse when he attempted to rob the three banks, or that all the evidence available to them tended to show this fact. No expert, or non-expert testimony was submitted in opposition.

The District Court, after the filing of the Report of the United States Medical Center for Federal Prisoners with regard to Pollard's mental condition, filed its opinion in which it found, contrary to the opinions of the expert psychiatrists, that appellant did not act under an irresistible impulse and, accordingly, found him guilty of the crimes charged. The court based its conclusions on the testimony of lay witnesses, on certain statements taken from the testimony of the experts or official reports of the United States Medical Center, and on its own personal judgment of the matter. The court concluded that it had no reasonable doubt of appellant's guilt.

It is submitted by the government that whether appellant acted as a result of an irresistible impulse was a question of fact which was determinable by the trier of the facts—in this case, by the District Court, sitting without a jury, and that it properly found appellant guilty.

Appellant's counsel contends that the government did not prove appellant guilty beyond a reasonable doubt; and, further, that there was no evidence to sustain the trial court's finding that appellant was guilty beyond a reasonable doubt.

A brief mention of certain leading cases on the question of insanity and irresistible impulse is pertinent.

We come, first, to the leading English case on the subject. In M'Naghten's Case (1843), 10 Clark and F. 200, 8 Eng.Reprint 718, 1 Car. and Kirw. 130, in answer to questions put by the House of Lords, as to a proposition of abstract law in respect to insanity, Her Majesty's Judges, speaking through Chief Justice Tindall of the Court of Common Pleas, and in agreement with Mr. Justice Maule, Lord Brougham, Lord Campbell, Lord Cottenham, Lord Wynford, and the Lord Chancellor, stated the rule that "notwithstanding the party accused did the act complained of with a view, under the influence of an insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law * * * ," and that "to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

The English statement of the rule, almost immediately brought forth a difference of view, and an important qualification in the United States. In 1844, the year after the announcement of the rule in M'Naghten's Case, the question

---

isted and that his actions may not have been consciously activated.

"It is therefore our opinion that during the period in question, Pollard, while intellectually capable of knowing right from wrong, may have been governed by unconscious drives which made it impossible for him to adhere to the right. It is our belief that this unconscious motivation, which could only be positively identified by prolonged analysis, might

have been related to guilt feelings in connection with the death of his wife and child, which compelled subsequent acts that would certainly lead to apprehension and punishment. We readily acknowledge our inability either to marshall sufficient objective facts or formulate a completely satisfactory theory on which to base a solid opinion as to subject's responsibility during the period in question."

came before the Supreme Judicial Court of Massachusetts in Commonwealth v. Rogers, 7 Metc. 500, and Chief Justice Shaw, speaking for the court, expressed the rule as to insanity, adding to it an element not recognized in the M'Naghten Case, as follows:

"In order to constitute a crime, a person must have intelligence and capacity enough to have a criminal intent and purpose; and if his reason and mental powers are either so deficient that he has no will, no conscience or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts.

"But these are extremes easily distinguished, and not to be mistaken. The difficulty lies between these extremes, in the cases of partial insanity, where the mind may be clouded and weakened, but not incapable of remembering, reasoning, and judging, or so perverted by insane delusion, as to act under false impressions and influences. In these cases, the rule of law, as we understand it, is this: A man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing; a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment. In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty.

"On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act, and its consequences; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that, if he does the act, he will do wrong and receive punishment; such partial insanity is not sufficient to exempt him from responsibility for criminal acts.

"If then it is proved, to the satisfaction of the jury, that the mind of the accused was in a diseased and unsound state, the question will be, whether the disease existed to so high a degree, that for the time being it overwhelmed the reason, conscience, and judgment, *and whether the prisoner, in committing the homicide, acted from an irresistible and uncontrollable impulse:* If so, then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it." (Emphasis supplied.)

Two years after the opinion of Chief Justice Shaw in Commonwealth v. Rogers, supra, the same general question came before the Supreme Court of Pennsylvania, in 1846, in the case of Commonwealth v. Mosler, 4 Barr 264, in which Chief Justice Gibson, speaking for the court, held that an act committed as a result of an irresistible impulse, did not subject the doer to liability for crime:

"The law is, that whether the insanity be general or partial, the degree of it must be so great as to have controlled the will of its subject, and to have taken from him the freedom of moral action.

"But there is a *moral* or *homicidal* insanity, consisting of an irresistible inclination to kill, or to commit some other particular offence. There may be an unseen ligament pressing on the mind, drawing it to consequences which it sees, but cannot avoid, and placing it under a coercion, which, while its results are clearly perceived, is incapable of resistance. The doctrine which ac-

knowledges this mania is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or at least to have evinced itself in more than a single instance. It is seldom directed against a particular individual * * *. The frequency of this constitutional malady is fortunately small, and it is better to confine it within the strictest limits. If juries were to allow it as a general motive, operating in cases of this character, its recognition would destroy social order as well as personal safety. To establish it as a justification in any particular case, it is necessary either to show, by clear proofs, its contemporaneous existence evinced by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature."

In Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 549, annotated in 70 A.L.R. 659, the court, referring to the view expressed in M'Naghten's Case, stated:

"This harsh rule is no longer followed by the federal courts or by most of the state courts. The modern doctrine is that the degree of insanity which will relieve the accused of the consequences of a criminal act must be such as to create in his mind an uncontrollable impulse to commit the offense charged. This impulse must be such as to override the reason and judgment and obliterate the sense of right and wrong to the extent that the accused is deprived of the power to choose between right and wrong. The mere ability to distinguish right from wrong is no longer the correct test either in civil or criminal cases, where the defense of insanity is interposed. The accepted rule in this day and age, with the great advancement in medical science as an enlightening influence on this subject, is that the accused must be capable, not only of distinguishing between right and wrong, but that he was not impelled to do the act by an irresistible impulse, which means before it will justify a verdict of acquittal that his reasoning powers were so far dethroned by his diseased mental condition as to deprive him of the will power to resist the insane impulse to perpetrate the deed, though knowing it to be wrong."

The court in Smith v. United States, supra, cited Davis v. United States, 165 U.S. 375, 17 S.Ct. 360, 41 L.Ed. 750, in support of its determination, and went on to say: "The doctrine of irresistible impulse, as adopted and followed by the Supreme Court, has been likewise followed in the courts of this District." As the District Court, in the instant case, held: The Federal Courts recognize "irresistible impulse" as a defense to criminal conduct.

In the instant case, the defense of insanity having been interposed, the burden was upon the accused to overcome the presumption of sanity by evidence sufficient to create a reasonable doubt as to his mental capacity to commit the offense. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499.

If the mere preponderance of evidence created a reasonable doubt as to whether appellant acted under an irresistible impulse, the government did not prove his guilt. When there has been created, by the evidence, a reasonable doubt as to whether an accused person acted under an irresistible impulse, the burden is upon the prosecution to establish, beyond a reasonable doubt, that he did not act under an irresistible impulse. Davis v. United States, supra, note 3; Matheson v. United States, 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631.

It is submitted by the government that, regardless of the unanimous testimony of six expert psychiatrists and a physician, appellant, in their opinion, acted under an irresistible impulse, and in spite of the fact that there was no

evidence by experts or laymen to the contrary, the trial court was entitled to exercise its independent judgment "by weighing of the case in its entirety, as opposed to being bound by what might be considered to be uncontradicted expert opinion evidence," and to find, under the evidence in this case, that, beyond a reasonable doubt, appellant did not act under an irresistible impulse.

In submitting its argument in support of the foregoing proposition, the government considers that the rule applicable to a court which tries a case without a jury is the same as that applicable to a jury, and that "the jury, even if testimony be uncontradicted, may exercise their independent judgment," citing The Conqueror, 166 U.S. 110, 131, 17 S.Ct. 510, 41 L.Ed. 937.

In McKenzie v. United States, 10 Cir., 266 F.2d 524, 527, the court held contrary to the foregoing contention of appellee in a case involving insanity in a criminal case. In the McKenzie case, appellant, on trial for kidnapping, interposed the defense of insanity. Similar to the expert testimony in the instant case, seven psychiatrists and physicians, all except one of whom were, or had been, employed by the United States, in the capacity of experts in mental disease or mental defects, testified that in their opinion, defendant was a paranoid psychotic, and did not know the difference between right and wrong, and was not criminally responsible for his acts. To establish the sanity of the defendant, the prosecution offered the testimony of lay witnesses who had observed him a short time prior to the alleged offenses, and of officers who made his arrest or questioned him later. As stated in the opinion of the court, two of the witnesses saw the defendant in a cafe and bar on the night on which the kidnapping occurred and testified that they noticed nothing unusual about his behavior. Two police officers testified that when the defendant was arrested he had a knife in his hand which he refused to give up and only dropped it when one of the officers loaded his shot gun. They further testified that defendant had voluntarily stated that the children he had kidnapped had not been harmed. A sheriff stated that defendant, while being taken to jail, told him that the two children he had kidnapped helped him to start his stalled automobile, and he decided to take them for a ride and buy them something to eat, but he had not harmed them. An agent of the Federal Bureau of Investigation testified he questioned the defendant the day after the crime and the defendant told him he had been drinking in various beer parlors the night before. He further testified that he observed nothing unusual about the defendant and he answered questions intelligently. It appeared that none of the witnesses was either acquainted with the defendant or aware of his previous conduct or behavior; they were not asked to express opinions as to his mental condition and were not qualified to do so. In its opinion, the court held that, before a non-expert witness is competent to testify as to the sanity or insanity of another person, he must show an acquaintance of such intimacy and duration as to clearly indicate that his testimony will be of value in determining the issue; and that the conclusion must be based upon the witness' testimony of behavior or conduct.

In the McKenzie case, the trial court had denied a motion for a judgment of acquittal and submitted the question of insanity to the jury. In reversing the District Court, the Court of Appeals said:

"The prosecution offered no medical testimony that defendant was sane. It relied entirely upon the testimony of non-expert witnesses to whom the defendant was a stranger. The substance of the evidence adduced by these witnesses was that they observed nothing unusual or abnormal about the defendant immediately before and after the alleged crime. This type of evidence has value only when the wit-

ness has had a prolonged and frequent opportunity to observe the subject. * * *

"As a general proposition, properly qualified lay witnesses may testify as to the sanity of an accused, and such testimony may be sufficient to satisfy the burden the law places upon the prosecution even though there is expert testimony to the contrary. Upon the whole, however, *we are constrained to the view in this case, in which the evidence of trained and disinterested psychiatrists, whose duty it was to determine the mental condition of the defendant, is so overwhelming as to his insanity, that if the burden of proving sanity beyond a reasonable doubt has any significance at all, it was not met by the meager evidence of the prosecution.* The motion for judgment of acquittal should have been granted". (Emphasis supplied.)

In State v. Brown, 36 Utah 46, 102 P. 641, 644, 24 L.R.A.,N.S., 545, in a case involving the defense of insanity to a criminal charge where the testimony of mental unsoundness was undisputed and there was no evidence of sanity, the prosecution relied on the claim that the jury could take into consideration defendant's apparently rational acts and conduct, before and at the time he committed the offense. The court disposed of the government's contention, as follows:

"There, no doubt, may be instances where the evidence offered by the defendant upon the question of his sanity is so weak and inconclusive that the state may well insist upon the presumption of sanity, and thus need not offer any evidence in rebuttal of defendant's evidence upon the question. Could it be said, however, that this is so in all instances because it may be so in some? It seems to us that this case offers a striking illustration that this cannot be so. In this case, as we have pointed out, the evidence of defendant's mental unsoundness before, at the time of, and after, the commission of the alleged offense is all one way. It comes from a class of witnesses who had ample opportunities to observe defendant's acts and conduct. Many of them knew him for a long term of years, and thus from time to time noted the change in his mental condition. * * * Among the witnesses were men who came in contact with crime and criminals almost daily, and as a part of their official duties, and thus could not be easily deceived. It was also shown that but few of all those witnesses had any special interest in the defendant. It is not a case where the testimony was limited to the friends of the family or relatives of the defendant who sought to shield the family from disgrace, but it is a case where a large number of witnesses, without any apparent interest or bias, all agree that the defendant before, at the time of, and after, the commission of the alleged offense was, and continued to be, insane, and that he was mentally irresponsible. Under such circumstances can it be said, with any show of reason, that there is any evidence in support of defendant's sanity?

"Counsel for the state contend that the jury were authorized to take into consideration defendant's acts and conduct before and at the time he committed the offense; that in doing what he did his acts seemed rational. In other words, that the defendant acted as others guilty of like acts ordinarily do when he committed the forgeries. Hence the jury were justified in finding him guilty. It seems to us, however, that when his acts are analyzed, they hardly support this contention. * * But if we assume that defendant intended to forge the checks, which he no doubt did, this is not alone sufficient to make an insane person guilty of a crime. As was well said by Mr. Justice Sullivan in Knights

v. State, 58 Neb. 228, 78 N.W. 509, 76 Am.St.Rep. 80: 'Such is not the law. * * * Ordinarily insane persons comprehend the nature of their acts. When they take life or destroy property, they usually know what they are doing, and often choose means singularly fitted to accomplish the end in view.' "

In Holmes v. State, 20 Tex.App. 110, the medical experts for both the defense and prosecution agreed that defendant was insane at the time the crime was committed and the jury, nevertheless, convicted. In reversing the conviction, the court said:

"We can never give our assent to a conviction for murder based alone upon the evidence as shown by this record.

"The defense was insanity. If expert testimony of physicians is to be credited; if opinions of persons who had known the defendant longest and known him best are to be believed; and if any faith whatsoever is to be put in the judgment of perfect strangers, which judgment is formed from the actions of the man, then we unhesitatingly say, in our opinion, the defense was established as conclusively as it is possible to establish insanity in ninety-nine cases out of a hundred."

■ In the instant case, the psychiatric witnesses had unanimously agreed that Pollard suffered from severe feelings of depression and guilt; that, in their opinion, he had an irresistible impulse to commit criminal acts; an unconscious desire to be apprehended and punished; and that he geared his behavior to the accomplishment of this end. The court, however, stated that his entire pattern of conduct during the period of his criminal activities militated against this conclusion, and that his conscious desire not to be apprehended and punished was demonstrably greater than his unconscious desire to the contrary. Without drawing any conclusions from the foregoing as to whether appellant's con-

scious or unconscious desires were the stronger, it is to be said that acts that appear rational are not to be taken by the factfinder as evidence of sanity, where all of the other evidence in the case is proof of a defendant's mental unsoundness.

It may here be mentioned, however, that in the Report of the Neuropsychiatric Staff Conference of the Medical Center for Federal Prisoners, it was pointed out that the attempted robberies by Pollard were bizarre and ineffectively planned and executed; that when he tried to leave one bank, he ordered a bank official to follow behind him instead of ahead of him, which resulted in his being caught from behind and barely escaping after a struggle, during which he dropped the paper bag of money he had collected; that on the various occasions of his attempted robberies, he would suddenly enter a bank that he had never seen before, without prior knowledge of the arrangement of the premises, or of the personnel. Taken in consideration with all of the other factors, such conduct, on the part of a highly intelligent police officer with a knowledge of how crimes are committed, has about it nothing of sanity.

It is true, as the government suggests, that the Report of the Neuropsychiatric Staff Conference of the Medical Center was an opinion that Pollard, during the period in question, *may* have been governed by unconscious drives which made it impossible for him to adhere to the right, and that the staff "acknowledges [its] inability either to marshall sufficient objective facts or formulate a completely satisfactory theory on which to base a solid opinion as to [Pollard's] responsibility during the period in question." However, the staff did conclude that "the weight of objective historical evidence available to us tends to support the conclusion of previous examiners" and that the current findings indicated that during the period of the attempted robberies "a disassociative state may have existed and that his actions may not have been consciously activated."

In its opinion, the trial court alluded to the testimony of lay witnesses, and stated that Pollard's conduct throughout the period following the murder of his wife and child by a drunken neighbor did not cause any concern among his colleagues, and that, in their opinion, he was sane; that his present wife married him a considerable time after the murders and that "It is a permissible inference that [his] conduct relative to his mental condition, as related by her, did not suggest to her that the defendant was insane."

As to Pollard's conduct, the record, stated in brief compass in this regard, discloses the following:

Before the murders of his wife and child, Pollard, as previously stated, was well adjusted, intelligent, of an active nature, pleasing personality, and happy disposition, with an excellent rating as a police officer, and a good husband and father, who had never been in any trouble. After the murders, Pollard became chronically depressed and continually seemed to be overcome by fatigue. He would repeatedly stare off into space and commence crying and would continue crying for as long as twenty minutes at a time. After such unusual conduct—including threats that he would commit suicide, he would wake up the next morning and remember nothing of such conduct. His fellow officers in the Police Department noticed various changes about him after the death of his wife. They weren't abrupt changes. Sometimes a week would pass and he would seem all right; but then he would do something out of the ordinary. In the course of his duties as a policeman, on one day he would insist upon enforcing the law and issue loitering tickets for violation of ordinances, and the next day, he would express an opinion that he did not see anything wrong with such conduct. When he would be asked a question by his fellow policemen, while driving with them in a scout car, he would sometimes be silent for about ten minutes, and then answer the question as though he had just been asked. Sometimes when he came to work with a fellow officer, they might talk to each other normally. Other times he would sit for two hours at a time and say nothing. This was a change from his prior general demeanor, when he had always been very lively and talkative. Once when he drove the scout car, he constantly beat on the steering wheel with his fist for approximately half an hour. When, on this occasion, he was asked if anything was wrong, he acted as though he didn't know he was doing it, and would continue. His wife would call Pollard's fellow officers and ask if they couldn't possibly come over because Pollard was acting unusual and she was afraid; that he was very strange and "messing around" with a gun, and that she was afraid he would shoot her. When he responded to roll call at police headquarters, he was almost always late, contrary to his prior promptitude; he would come in and appear to be sleepy all of the time. He would act lifeless and the police officers, as one of them stated, all started worrying about him. Shortly before he remarried, on occasion, he would attend a party and appear jovial, eating, dancing, and talking, and then would quickly change. He would suddenly sit down, stop dancing, refrain from eating with the others, and become very quiet. While, at all times, he regarded his present wife with affection, nevertheless, on one of the occasions mentioned, when he was at home with her, he kept holding his gun with the barrel pointed toward himself; and his wife became afraid of him, but kept talking to him, and trying to distract him by asking him to go to a party; but he started crying until tears streamed down his cheeks. Suddenly, in fear, his wife ran out of the house and called the police station, asking that his friends there come over. His fellow officers soon arrived and took his gun away from him, and had him go to the police station with them. He afterward called his wife from the station, but did not mention the incident and talked as though nothing had happened. At that

time, he was in a jovial frame of mind, and, with his partner on the police force, returned home where they all conversed pleasantly for some time about things in general. His wife underwent several similar experiences. Often he appeared not to hear people talking to him. The officers all knew something was wrong; but one of them stated that they couldn't report every person that acts out of the ordinary.

From all of the evidence of the lay witnesses, which we have here summarized, it cannot be affirmatively concluded that Pollard was sane. Obviously, as a result of the murder of his wife and child while he was absent from his home, he was suffering from some grave disorder, and that disorder was, in the opinion of all the psychiatric and medical experts, a disassociative reaction resulting in Pollard's commission of the acts charged because of an irresistible impulse.

At the conclusion of the case and after the rendition of the court's opinion, but prior to certain slight amendments the court announced it would make therein, defense counsel submitted that the evidence of the three psychiatrists who testified in court was testimony offered by the best available scientific minds, and that, further, the official report of the psychiatrists of the United States Medical Center for Federal Prisoners, while not as conclusive as the testimony of the three psychiatric witnesses, would, in itself, raise a reasonable doubt as to appellant's responsibility for his acts. In reply, the trial judge stated that he had no reasonable doubt as to appellant's responsibility for his acts, and that, even if there were additional psychiatrists testifying for appellant, such evidence would not cause him to change his mind; that appellant knew what he was doing; that he knew right from wrong; that many wrongdoers, responsible for their conduct, commonly pleaded irresistible impulse; that simply because a man would not resist doing something he knew was wrong, was no excuse for his misdeeds; and that appellant was not

suffering from that kind of diseased mind which excused and exculpated him from his criminal acts.

However, certain distinctions have been drawn by courts in applying the rule of irresistible impulse. While anger, greed, and passion are said, in ordinary parlance, to result in acts because of desires that have become irresistible, this is not, in law, the "irresistible impulse" that results from a mental defect or mental disease. Further, it is held that "emotional insanity," which is an unbridled passion lasting just long enough to enable the act complained of to be done, and then subsiding, does not relieve the accused of accountability, even in those jurisdictions where the doctrine of irresistible impulse, arising out of a mental defect, is recognized. People v. Finley, 38 Mich. 482; Commonwealth v. Wireback, 190 Pa. 138, 42 A. 542. Moreover, to like effect, in Bell v. State, 120 Ark. 530, 180 S.W. 186, 196, the court, although sustaining the doctrine of irresistible impulse as a defense to crime, distinguished between such impulse and "emotional" insanity, as follows: "But it must be remembered that one who is otherwise sane will not be excused from a crime he has committed while his reason is temporarily dethroned not by disease, but by anger, jealousy, or other passion."

The general rule is stated in 14 Am. Jur., page 793: "Irresistible impulse as recognized by the courts is an impulse induced by, and growing out of, some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity."

It is emphasized by the government that Pollard was motivated to attempt the bank robberies because of his need for financial security. This, the government claims, is shown by the confession he signed, in which he stated:

"On May 21, 1958, I was reflecting about the hard life that my first wife and I had led in attempting to achieve financial security. Inasmuch as I was about to marry my second wife, I decided that I would not lead the same type of financially insecure life that I led with my first wife. I needed about $5,000 in order to buy a house. My only purpose in deciding to rob a bank was to obtain $5,000 and, if I obtained the money, I did not intend to continue robbing."

The claimed motivation seems pointless. Pollard, during his first marriage, had been receiving the regular salary of a policeman with promotions, of approximately $450 a month. His first wife, at that time, was receiving about $300 a month as a clerk with the Michigan Unemployment Compensation Commission. Their joint income was almost twice what a regular policeman's salary would be. His second wife, at the time of her marriage to him, had money of her own—enough to pay her own bills, and take care of her daughter with the money which was paid for support by her former husband. She had previously held a position for six years with the Michigan Bell Telephone Company. She considered herself to be relatively comfortable financially. Between the time of Pollard's arrest on June 11, 1958, and his trial, she had, herself, paid off about $700 in bills that he had owed. Pollard's financial condition could not be considered a reasonable motivation for his attempted bank robberies. As far as income went, he was much better off than most other policemen and if such a financial condition could be considered a reasonable motivation for Pollard's attempted robberies, every other policeman in the department would have had twice the motivation to commit such crimes as Pollard had.

In the scholarly opinion of the District Court, reference is made to quotations from different authorities on the subject of psychiatry. This important science, in a state of rapid development, suffers in the public mind from the diversity and contrariety of views expressed by various students of the subject in countless books and magazine articles. The trial court obviously was not guided in its decision by such statements for they would be of little value in actual controversies before the court, without the benefit of cross-examination of the persons who make such statements. Where, for instance, it is said by a writer that psychiatry takes a deterministic position with regard to behavior, the statement is not helpful. Even if relevant, the point might well be disputed— as well as the declaration of another writer, that the "best psychiatry is still more of art than of science." On the trial, in the examination of one of the government's psychiatric witnesses who testified that, in his opinion, appellant acted under an irresistible impulse, the trial court—in probing for an expression of views—read a statement to the witness from a book by a psychiatrist, in which it was stated that a certain authority "has been most blunt in denying that serious crimes can be committed under irresistible impulse"; and the court then stated to the witness: "That is a very bold statement in the light of what you have just stated." In reply, the witness nevertheless declined to be bound by the view expressed by such writer and declared that, in his experience, he thought there were definite exceptions to the author's statement, and that individuals could understand situations and, still, "carry out an impulsive act which to him might be definitely irresistible, and I would consider definitely irresistible."

Many medical and non-medical writers express themselves freely in books and articles on the subject of psy-

chiatry. What is so written cannot be accepted as authority in a court of law. Only testimony, subject to cross-examination, can be so considered—with an exception to be noted, in this case, that where a report of government experts in psychiatry is introduced in conformity with the statute, it requires consideration by the court.

Psychiatry is a great and important science upon which the legislative and judicial branches rely. Federal statutes provide for psychiatric examinations of persons accused of crime, as well as those deemed to be suffering from mental illness or insanity. Courts consider evidence from psychiatric experts in arriving at a determination whether an accused is not guilty of crime by reason of insanity. In the instant case, the District Court, in committing Pollard for examination, stated that it thought the best facility available to give independent advice to the court on Pollard's mental responsibility for the alleged criminal acts, was the United States Medical Center for Federal Prisoners, and that it wanted to be guided by the information it obtained from the Center. In the light of the foregoing, it is unnecessary to consider the disparaging views of certain psychiatric writers that it is futile to rely upon evidence of psychiatrists, or that no crimes can be committed under irresistible impulse.

During the consideration of the case—but before its conclusion—it was a matter of great anxiety on the part of the humane and conscientious trial court that if Pollard were found to have acted under an irresistible impulse, and the court found him not responsible for his conduct, he could not be committed to a mental institution for cure, and the public would still be imperiled by possible similar conduct on the part of Pollard in the future. However, according to statute, if any person charged with crime be found, in the federal court in which he is so charged, to be an insane person,

such court shall certify the same to the Secretary of Health, Education and Welfare, who may order such person to be confined in St. Elizabeth's Hospital in the District of Columbia; and when such person shall be restored to sanity, the superintendent of the hospital shall give notice thereof to the judge of the criminal court, and deliver him to the court in obedience to the proper precept. Title 24 U.S.C.A. §§ 211, 211b.

█ It is our conclusion from the record in this case that in the light of the unanimous testimony of the government's medical experts in psychiatry and appellant's expert witness, as well as the uncontradicted evidence of the lay witnesses, the presumption of sanity was overcome, and the government failed to sustain its burden of proving that appellant did not suffer from mental illness consequent upon the unprovoked murder of his wife and child while he was absent on police duty; and that it failed to prove that appellant did not act under irresistible impulse as a result of such mental illness.

In accordance with the foregoing, the judgment of the District Court is set aside and the case remanded for further proceedings consonant with this opinion.

SIMONS, Senior Judge (dissenting).

I greatly regret my inability to concur in the able, and thoroughly researched opinion of the Chief Judge reversing the conviction in the above case. I follow the fact findings of the District Judge (D.C., 171 F.Supp. 474) and agree that they substantially sustain his conclusion that the Appellant was sane when he committed the crimes charged. Particularly am I unable to entertain the concept that the Appellant wished to be apprehended, while at the same time, yielding to an irresistible impulse to commit the crimes, and to escape detection and apprehension. I would sustain the conviction.